John S. WARREN, as Special Administrator of the Estate of James D. Bowen, Deceased, Libelant,

v.

The FLYING TIGER LINE, INC., a corporation, Respondent.

Kara GLYNN, Administratrix of the Estate of Walter Glynn, Deceased, Libelant,

v.

The FLYING TIGER LINE, INC., a corporation, Lockheed Aircraft Corporation, Respondents.

Thelma Jean KISSEE, as Administratrix of the Estate of Charles Edward Kissee, Deceased, Libelant,

v.

The FLYING TIGER LINE, INC., a corporation, Respondent.

Sue PRATHER, Administratrix of the Estate of Douglas Arnold Haaf, Deceased, Libelant,

v.

The FLYING TIGER LINE, INC., a corporation, Respondent.

Nos. 63–301, 63–1530, 64–318, 64–336.

United States District Court
S. D. California,
Central Division.

Sept. 21, 1964.

Loeb and Loeb, Alfred I. Rothman and Jerome L. Goldberg, Los Angeles, Cal., for John S. Warren.

Mathews and Cloud, Rialto, Cal., for Kara Glynn.

Charles A. Zeller, Stockton, Cal., for Thelma Jean Kissee; Jerome L. Goldberg, Los Angeles, Cal., Local Associated Counsel.

Magana, Olney, Levy, Cathcart and Gelfand, Los Angeles, for Sue Prather.

Kirtland and Packard, Los Angeles, Cal., for respondent.

CARR, District Judge.

These 4 cases in admiralty seek damages under Section 761 of Title 46, U.S. C., for the wrongful death of certain military passengers who were aboard a Flying Tiger Line plane traveling from Travis Air Force Base in California to Saigon, Vietnam. These cases were consolidated for trial on the issue of the applicability of the Warsaw Convention.[1]

On March 14, 1962, Flying Tiger Line, hereinafter referred to as "FTL," flight No. 7815/13 departed Travis Air Force Base, California, at approximately 5:45 a. m., carrying 96 passengers—92 members of the armed services of the United States, 3 Vietnamese soldiers, and one person in civilian clothes. The status of this passenger is not entirely clear. The 92 United States soldiers were destined for the Tan Son Nhut Air Base, Saigon, Vietnam, by way of Honolulu, Wake Island, Guam, and Manila. The Military Air Transportation Service of the United States, hereinafter referred to as "MATS," had entered into a service order

1. Convention for the Unification of Certain Rules Relating to International Transportation by Air, 49 Stat. 3000, et seq. (1934).

and call agreement with FTL for the transportation of the 96 passengers. Pursuant to the service call and agreement, the airship, a Constellation, was ferried from San Francisco to Travis by FTL and the servicemen were there assembled for boarding for the trip.

On March 14, 1962, the servicemen appeared at the MATS window with their orders and were processed and they were given a MATS boarding pass and a MATS claim check. They went to the boarding gate where they were checked through by military personnel. They then proceeded to the ramp of the plane at which point a stewardess passed to each a ticket which is sometimes in the record referred to as a boarding ticket. The passengers then entered the plane and chose their seats since no prearrangement for seats was made. Very shortly thereafter a stewardess went through the emergency procedures and at that time told the passengers that they should write their ticket number on their claim check.

The tickets which had been prepared by FTL did not contain the names of the passengers and were given to the stewardess who distributed them at the ramp of the plane as the passengers approached to board the plane. The evidence indicated that the stewardesses were under instructions that no passenger was to board the plane without a boarding ticket. In fact, these instructions were in writing which stated: "Under no circumstances will *any* passenger be permitted aboard an FTL aircraft without a Boarding Ticket." [Emphasis original.]

Stewardess Hernandez testified that she distributed boarding tickets to all of the passengers at the foot of the ramp to the plane. She and 3 other stewardesses were relieved at Wake Island and thereby escaped the catastrophe.

The evidence relating to the control of the plane and the flight established that Max Oldford, the station manager for FTL at Travis, prepared the flight plan and prepared boarding tickets without the names of passengers on them. The boarding tickets were prepared on a duplicating machine. Usually approximately 10% more tickets were prepared than the estimate supplied by MATS of the number of passengers. Approximately 20 minutes prior to boarding time, Oldford delivered the manifest to an FTL employee aboard the plane. MATS determines the destination, the official stopping points, the time of departure, and also designates the passengers.

FTL staffs and maintains its planes. FTL pilots operate the planes, and FTL employees attend to all phases of service on the plane while en route.

The flight in question is generally referred to as a chartered flight arranged between MATS and FTL. The service and call agreement does not mention the Warsaw Convention. It does provide that FTL is to be paid by MATS on a per passenger basis.

The plane proceeded to Honolulu, Wake Island, and arrived at Guam at 15/1114 and departed there at 15/1257, supposedly traveling to Clark Air Force Base, Manila. The last word heard from the plane was at 1422 GMT, approximately one hour and a half after it had departed from Guam. Thereafter the plane disappeared and has not been heard from since.

The boarding pass issued by MATS did not contain a reference to the Warsaw Convention. The boarding ticket passed out to the servicemen at the foot of the ramp to the plane made reference to the Warsaw Convention both on the front of the ticket and in the conditions on the back of the ticket, which is set out as follows:

Front:

Issued by

# THE FLYING TIGER LINE INC.

Lockheed Air Terminal
Burbank, California

**BOARDING TICKET**

**B 13646**

| Charter Group | | | | | |
|---|---|---|---|---|---|
| Name of Passenger | | | | | |

Issued at

## FLIGHT INFORMATION

| FROM | TO | DATE | TIME | FLIGHT No. |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

DATE: _____

This Boarding Ticket is subject to all of the terms and conditions of the contract between the Carrier and the Charter Group named hereon, which terms and considerations are incorporated by reference, and to the conditions on reverse side hereof.

Transportation under this Boarding Ticket, hereinafter called "ticket," is subject to the rules relating to liability established by the Convention for the Unification of Certain Rules Relating to International Transportation by Air signed at Warsaw, October 12, 1929, if such transportation is "International transportation" as defined by said Convention.

Always keep in possession as this is your only ticket. Show to Passenger Agent when checking in and to Stewardess when boarding plane, and elsewhere as required.

Back:

### CONDITIONS

1. As used herein, "ticket" means "Boarding Ticket," "carriage" is equivalent to "transportation," and "Carrier" includes the air carrier issuing this "Boarding Ticket" and all air carriers that carry the passenger or his baggage hereunder or perform any other service related to such air carriage. For the purposes of the exemption from and limitation of liability provisions set forth or referred to herein, "Carrier" includes agents, servants, or representatives of any such air carrier. Carriage to be performed hereunder by several successive carriers is regarded as a single operation.

2. (a) Carriage hereunder is subject to the rules relating to liability established by the Convention for the Unification of Certain Rules relating to International Carriage by Air, signed at Warsaw, October 12, 1929 (hereinafter called "the Convention") unless such carriage is not "international carriage" as defined by the Convention.

(b) To the extent not in conflict with the foregoing, carriage hereunder and other services performed by each carrier are subject to (i) applicable laws (including national laws implementing the Convention), government regulations, orders and requirements; (ii) provisions herein set forth.

3. Insofar as any provision contained or referred to in this "Boarding Ticket" may be contrary to mandatory law, government regulations, orders or requirements, such provision shall remain applicable to the extent that it is not over-ridden thereby. The invalidity of any provision shall not affect any other part hereof.

4. Except as the Convention or other applicable law may require otherwise: (a) Carrier is not liable for any death, injury, loss or claim of whatsoever nature (hereinafter collectively referred to as "damage") arising out of or in connection with carriage or other services hereunder, unless such damage is proved to have been caused by the negligence or wilful fault of the Carrier and there has been no contributory negligence of the passenger; (b) Carrier is not liable for any damage directly or indirectly arising out of compliance with laws, government regulations, orders or requirements or from any cause beyond Carrier's control; (c) In any event liability of Carrier for death, injury or delay of a passenger shall not exceed 125,000 French gold francs (consisting of 65½ milligrams of gold with a fineness of 900 thousandths) or its

equivalent; (d) liability of Carrier in respect of baggage and other personal property is limited to its declared value which shall not exceed $100 (U. S. currency) or its equivalent per passenger; (e) a Carrier issuing a ticket or checking baggage for carriage exclusively over the lines of others does so only as sales-agent; (f) no action shall be maintained in the case of damage to baggage or other property unless written notice of the claim is presented to the office of carrier within three days from the date of receipt thereof, and in the case of delay or loss, unless such written notice is so presented within 14 days from the date the baggage or other property is placed at the passenger's disposal (in case of delay) or should have been placed at passenger's disposal (in case of loss). Any right to damages against the Carrier shall be extinguished unless an action is brought within two years after the occurrence of the events giving rise to the claim.

5. This "Boarding Ticket" is good for carriage for the person named hereon from the place of departure to the place of destination at the approximate times and on the scheduled dates listed hereon. Times shown hereon are approximate and not guaranteed. Schedules are subject to change without notice. Carrier assumes no liability for making connections. Carrier may, without notice, substitute alternate carriers or aircraft, and, if it deems advisable because of any fact beyond its control, divert, postpone or delay any flight without any liability, and determine if any departure or landing should be made.

6. The passenger shall comply with all government travel requirements, present all exit, entry, or other documents required by law, and arrive at the airport by the time fixed by Carrier, or, if no time is fixed, sufficiently in advance of flight departure to permit completion of government formalities and departure procedure. Carrier is not liable for loss or expense due to passenger's failure to comply with this provision.

7. No agent, servant or representative of Carrier has authority to alter, qualify or waive any provision hereof.

Issued by THE FLYING TIGER LINE INC.

The respondent FTL in all of these cases has pleaded as an affirmative defense that the "Convention for the Unification of Certain Rules Relating to International Transportation by Air," an additional protocol signed at Warsaw, Poland, October 12, 1929, and hereinafter referred to as "the Warsaw Convention," limits the liability of respondent in these cases. Under the Warsaw Convention, respondent would be liable for no more than 125,000 francs, or approximately $8,300.00 at the rate of exchange specified in the Convention, article 22. Both the United States and Vietnam are signatories to the Warsaw Convention. Article 1, paragraph (1), of the Convention provides in part as follows:

" * * * This convention shall apply to all international transportation of persons, baggage, or goods performed by aircraft for hire. * * * "

Article 1, paragraph (2), of the Convention provides in part as follows:

" * * * For the purposes of this convention the expression 'international transportation' shall mean any transportation in which, according to the contract made by the parties, the place of departure and the place of destination, whether or not there be a break in the transportation * * * are situated either within the territories of two High Contracting Parties * * * "

■ Although in the instant case the place of departure and place of destination are situated within territories of two high contracting parties, libelants contend that the Convention is not applicable since the passengers were military men traveling under military orders and thus were not free to contract for the travel in question.

This contention of libelants appears to run counter to the adjudicated meaning of article 1, paragraph (1) of the Convention. In Ross v. Pan American Airways, 299 N.Y. 88, 85 N.E.2d 880, 13 A.L.R.2d 319, the court pointed out that the limitation was created by the Convention and was not the product of consensual arrangement between the parties. The court said at 85 N.E.2d 885, 13 A.L.R.2d 327–328:

"Furthermore, while the Convention speaks of transportation under a 'contract' and requires delivery of a ticket warning of the limitation, it is plain that the limitation is one created by the Convention itself, and is not the product of consensual arrangements between the parties. Paragraph 2 of article 1, in its reference to 'the contract made by the parties' means, obviously and on its face, not that the Convention applies only when the parties contract for its application, but that it applies (unless by special arrangement otherwise) whenever, 'according to the contract made by the parties,' the place of departure and the place of ultimate destination are within the territories of two of the 'High Contracting Parties' or both within the territory of a 'single High Contracting Party' with certain agreed stopping places elsewhere. Put another way, that means that the Convention becomes the law of the carriage when the 'contract' of the parties provides for passage between certain described termini. When such is the contract, then the Convention has automatic full impact, by its own terms and not because the parties have so agreed. The requirement of article 3 of the Convention, quoted in the third paragraph of this opinion, that there must be delivery of a ticket is thus a condition set up by the Convention itself, as a determinant of the applicability, or no, of the Convention's limited liability rules; but that is by no means the same thing as saying that the limitation is a contractual one, depending for its existence and validity on express assent thereto by the passenger. Since the Convention itself, as a statute, grants and mandates the limitation unless 'the carrier accepts

a passenger without a passenger ticket having been delivered,' there is no need for a carrier who claims the limitation to show more than the delivery of an appropriate ticket, and travel of the passenger thereunder."

It has been held that a charter flight for transportation of military personnel from the territory of one signatory power to that of another is international transportation within the meaning of the Warsaw Convention. (Mertens v. Flying Tiger Line, Inc., 35 F.R.D. 196 (S.D. N.Y., 1963).) See also Grey v. American Air Lines, 95 F.Supp. 756 (S.D.N.Y., 1950), 227 F.2d 282 (2 Cir., 1955).

Reference to the discussions at the Hague Conferences in 1955, called to consider changes in the Warsaw Convention, gives some indication relative to the interpretation placed upon the Warsaw Convention respecting international transportation. The Hague Protocol [2] amending the Warsaw Convention has not yet been adopted by the United States. It was pointed out at that time that passengers traveling pursuant to a military charter were doing so under military orders and not of their own free will. The delegates to the Hague Conference appeared to feel that it should be clear that military charter flights are included under the reservation to article 2 of the Warsaw Convention as reserved by the Additional Protocol to such convention. This would seem to indicate, at least in the minds of the delegates, that the limitations of liability did apply to charter flights by the military. It should also be noted that, in a letter to the Secretary of State, N. E. Halaby of the Federal Aviation Agency and Chairman of the Interagency Group on International Aviation stated that the Department of Defense had requested that in the event the United States ratified the Hague Protocol the reservation permitted by article 26 be declared by notification that the Convention, as amended by the protocol, shall not apply "to the carriage of persons, cargo and baggage for United States military authorities on aircraft * * * the whole capacity of which has been reserved by or on behalf of such authorities." A copy of this letter appears in the Department of State Bulletin of September 3, 1962, Exhibit 5 of this case.

In considering the questions presented in this case, the purposes of the Warsaw Convention must be kept in mind. As former Secretary of State Hull pointed out in his letter to the President sending the Convention to him for transmission to the Senate, the Convention benefited passengers by creating a presumption of liability on the mere happening of an accident and described the beneficial purposes of the Convention to be:

"It is believed that the principle of limitation of liability will not only be beneficial to passengers and shippers as affording a more definite basis of recovery and as tending to lessen litigation, but that it will prove to be an aid in the development of international air transportation, as such limitation will afford the carrier a more definite and equitable basis on which to obtain insurance rates, with the probable result that there would eventually be a reduction of operating expenses for the carrier and advantages to travelers and shippers in the way of reduced transportation charges." (Senate Doc., executive G, 73rd Cong., 2nd Sess., p. 3.)

The Warsaw Convention eliminates many conflict of law questions which would have otherwise confronted passengers, shippers, and airlines. The Convention also placed the burden of proof on the carrier by providing that the carrier is liable for damage unless it proves that it and its agents have taken all necessary measures to avoid damage. In the absence of the Convention, the law

2. Protocol Amending Convention for the Unification of Certain Rule Relating to International Carriage by Air, dated at the Hague September 28, 1955, Senate Doc., executive H, 86th Cong., 1st Sess., pp. 5 et seq. (1959).

of the United States would require a claimant in varying degrees to explain the accident and prove that the loss or damage resulted from specific negligence or wilful act of the carrier. Under the Convention, the rights of passengers, shippers, and air carriers are the same in all of the countries parties to the Convention. Without the Convention, a single flight might involve the laws of many different countries, placing upon the passenger the burden of attempting to establish a claim under the most difficult, if not impossible, circumstances. As a matter of fact, in some countries without the Convention the claimant might well find himself without any remedy whatsoever.

As pointed out in *Ross*, the aims of the Convention would be poorly served if it were held that the limitation of liability is available only where the carrier proved a consensual agreement. It seems evident that the Convention anticipated the application of the limitation of liability where the carrier complied with article 3, which, among other things, required that a ticket be delivered to the passenger with a statement on it that the transportation was subject to the rules relating to liability established by the Warsaw Convention.

■ Libelants' next contention is that there was no delivery of a requisite ticket as required by article 3. In particular, libelants assert that paragraph (2) of article 3 applies upon the premise that no ticket was actually delivered. That paragraph provides that, if the carrier accepts a passenger without a passenger ticket's having been delivered, the carrier shall not be allowed to avail itself of the provisions of the Convention which limit its liability. Libelants' contention cannot be sustained, for the evidence clearly establishes that a ticket was delivered to each and every passenger at the ramp of the plane and prior to the passengers' actually boarding the plane. As heretofore indicated, the evidence also showed that the stewardess advised the passengers at the time of the presentation of the emergency procedures to note

their ticket number on their claim check, apparently doing this to call their attention to their ticket. The front of the ticket clearly indicates that the transportation under the boarding ticket was subject to the Warsaw Convention. See *Seth v. British Overseas Airways Corporation*, 329 F.2d 302 (1 Cir., 1964). Also, there were conditions printed on the back of the ticket referring to the Warsaw Convention; but it must be said, in all frankness, that it would be most difficult for one to read the fine print without a magnifying glass.

It appears that the delivery of the ticket did meet the requirements of article 3, although the evidence did indicate that the ticket did not set forth the agreed stopping places. Apparently the purpose of setting forth the stopping places is to make known to the passengers the possibility that the trip might involve international transportation— for example, a trip from Detroit to New York by way of Canada where a stop was to be made in Canada. In the instant case, since the ticket showed the destination to be Vietnam, there could be no question regarding the "international transportation" and thus there was no compelling reason for setting forth the stopping places between the United States and Vietnam.

■ The other point made by libelants respecting the ticket's not meeting the requirements of article 3 cannot be sustained since it is well established that the absence of the name of the passenger on the ticket is not an irregularity which precludes the carrier from asserting the limit of liability under the Convention.

In *Ross*, the court pointed out that there is no need for the carrier which claims the limitation to show more than the delivery of an appropriate ticket and the travel of the passenger pursuant to the ticket. In that case the ticket was picked up by an agent of the plaintiff who claimed that she had never seen it. The evidence would indicate that it had been placed in front of her at the counter when

she was proceeding through customs. The *Mertens* case held that the name of the passenger was not required to be on the ticket. It should be noted that article 3, paragraph (2), provides:

"\* \* \* The absence, irregularity, or loss of the passenger ticket shall not affect the existence or the validity of the contract of transportation, which shall none the less be subject to the rules of this convention. \* \* \*"

 Libelants also contend that the flight is subject to the reservation[3] that the Convention does not apply to international transportation which is performed by the United States. The cases which have dealt with this subject hold to the contrary. In *Mertens*, the court held that transportation for military passengers from California to Japan furnished by the defendant airline under charter to the United States Government was an international flight pursuant to the terms of the Warsaw Convention. See also Flying Tiger Line, Inc. v. United States, 170 F.Supp. 422, 145 Ct.Cl. 1 (1959). In *Ross*, the plane was not under charter, but transportation was paid for by the United States for the U.S.O. entertainers. The court held that the transportation was not performed by the government and, therefore, the Warsaw Convention did apply. The court stated at 85 N.E.2d 886, 13 A.L.R.2d 329:

"Taking either wording of the reservation, it is plain that appellant's transportation was not 'performed by the United States.' The United States Army, apparently, bought appellant's ticket but her transportation was, as she herself alleged in paragraph Fourth of her complaint here, on an aircraft 'owned, operated and controlled by the defendant.'"

In the instant case, the aircraft was owned, operated and controlled by respondent Flying Tiger.

Libelants assert that all of the governmental agencies dealing with international air transportation have interpreted and construed the Convention to be inapplicable (without the necessity of the adoption of the Hague Protocol) to military charter flights. The only such interpretation of a governmental agency which has come to the attention of this court is that of the Department of Defense which is indicated in a letter from Alfred P. Rubin, Assistant General Counsel of the Office of International Affairs. (Exhibits 3, 4, and 7.) In his letter he states that the Department of Defense has been of the opinion that the reservation excludes chartered aircraft for international carriage by the United States Government. In the very same letter, he stated:

"However, in discussions leading to the 1955 Hague Protocol, it became clear that the scope of the 1929 Additional Protocol was *susceptible to different interpretations.*" [Emphasis supplied.]

While this interpretation may be of some assistance, it is not necessarily persuasive.

Libelants also assert that the legislative history of the Warsaw Convention and proposed amendments thereto demonstrates that the Convention is inapplicable to MATS chartered flights. A careful search of the material available does not indicate any information to show what the specific intent was with respect to the reservation. Libelants claim that the proposed adoption of the Hague Protocol affirms the nonapplicability of the Convention to MATS flights; but a review of the Hague Protocol indicates

---

3. This reservation was proclaimed by the President with reference to Article 2 under the Additional Protocol which provides:
"The High Contracting Parties reserve to themselves the right to declare at the time of ratification or of adherence that the first paragraph of article 2 of this convention shall not apply to international transportation by air performed directly by the state, its colonies, protectorates, or mandated territories, or by any other territory under its sovereignty, suzerainty, or authority."
49 Stat. 3025.

to the contrary. As heretofore noted in this opinion, the discussions at the Hague Conference in 1955 reveal that the delegates proposed an amendment which would make certain that the reservation did apply to chartered military flights.

It should be noted that in 1947 the Legal Committee of the International Civil Aviation Organization undertook to study this matter and draft a proposed protocol to the Convention known as "the Rio Draft," which it presented to the I.C.A.O. Council for further action. In 1953, the Rio Draft was circulated to all members of the I.C.A.O. and thereafter the Hague Conference was called to consider the Rio Draft, but it was rejected. That draft had provided that "The Convention shall not apply to * * * Carriage of persons, cargo and baggage for military authorities by aircraft the whole capacity of which has been reserved by such authorities." (International Civil Aviation Organization, Doc. 7424—LC/135; or see 20 Jour. of Air Law & Comm., at p. 326.) In place thereof, the Hague Conference substituted Article XXVI, which provided:

"No reservation may be made to this Protocol except that a State may at any time declare by a notification addressed to the Government of the People's Republic of Poland that the Convention as amended by this Protocol shall not apply to the carriage of persons, cargo, and baggage for its military authorities on aircraft, registered in that State, the whole capacity of which has been reserved by or on behalf of such authorities."

The legislative history more persuasively supports the conclusion that the reservation did not apply to military chartered flights.

From the foregoing it appears that the court must conclude that the chartered flight in the instant case was not international transportation by air performed directly by the state.

■ Another contention advanced by libelants is that respondent contractually waived the liability limitations of the Warsaw Convention. Reliance is placed upon article 22(1) of the Convention which provides:

"Nevertheless, by special contract, the carrier and the passenger may agree to a higher limit of liability."

Libelants predicate the instant contention upon the fact that Attachment B to the call agreement (Exhibit 1) provided that FTL should obtain, for all charter flights, passenger bodily injury liability insurance in the amount of $50,000 per passenger. This, libelants say, demonstrates a contractual waiver of the liability limitations of the Warsaw Convention. There appear to be many reasons why this contention cannot be sustained.

First, it will be noted from the above quoted portion of article 22 that provision is made for a special contract between "the carrier and the passenger." The contract of insurance here was not between the passenger and respondent but was between MATS and respondent.

There are many other reasons which could well account for the insurance requirement in the call agreement other than a waiver of the limit of liability. For example, it appears that the Department of Defense was not entirely certain as to whether the limit of liability under the Warsaw Convention applied and undoubtedly was seeking to protect the servicemen who were making the flight, in the event such was the case. The insurance might well have been a protection in a situation where either there was wilful misconduct or a passenger ticket had not been delivered. In both cases the limitations of liability are not applicable.

Another thing which suggests a reason for the insurance is found by reading the call agreement which clearly indicates the possibility of the transportation of non-military personnel on chartered flights, in particular, dependents. Those civilian passengers would not be prevented from suing the government under Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), which

precludes a soldier from suing the government under the Tort Claims Act.

Libelants appear to place some reliance upon a memorandum addressed to FTL, dated July 10, 1963, to which is attached what purports to be a superseding Attachment B Insurance (Exhibit E). Both the memorandum and this Attachment B refer to the Warsaw Convention. While these documents came into existence more than a year after the disappearance of the plane in question, they do throw considerable light on the particular matter which is under consideration. The memorandum specifically advises that, in the event the transportation is determined by a court of competent jurisdiction to be subject to the Warsaw Convention, the insurance required by the contract shall be considered to be "a higher limit of liability agreed to by special contract as contemplated by the last sentence of Article 22(1) of that Convention." The memorandum also obviously attempts to avoid the application of the limitation of liability to transportation on MATS flights. It states in substance that, if the carrier is required by law or regulation to issue charter tickets to all passengers including MATS passengers which advise of the limitation of liability under the Warsaw Convention, that "MATS does not concur and does not authorize issuance of such tickets to MATS passengers unless * * *." Thereafter follows the language suggested to be placed upon the ticket which states that if transportation is determined by a court of competent jurisdiction to be subject to the Warsaw Convention then the insurance required by the contract shall be considered to be the higher limit of liability agreed to by special contract as contemplated by article 22(1). It should be noted that the memorandum states, "Compliance with this request is mandatory."

While the superseding Attachment B was not in effect at the time of the instant catastrophe, it does prompt the question as to why the necessity of such a document providing for a special contract limiting liability if there was such a limitation under the service and call agreement in effect at the time of the disappearance of the plane.

Article 22 requires a definite and explicit contract by its terms in that it provides that a higher limit may be provided for "by special contract." To support libelants' contention it would be necessary to create a contract by implication upon facts which are, to say the least, equivocal.

These cases are the kind that present a great temptation to resort to interpretive ingenuity, but, after careful consideration, it must be concluded that the limitation of liability provided by the Warsaw Convention limits the recovery of libelants to the amount specified in such Convention. Judgment will be entered accordingly.

In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, this opinion shall serve as findings of fact and conclusions of law.

This opinion actually constitutes a final determination, after a trial, on the issue as to the limitation of liability under the Warsaw Convention in 40 pending cases, 36 of which are in the Northern District of California and 4 in this District. This is agreed to by stipulation. If this opinion has interpreted the law correctly, it is quite unlikely that the trial of these cases will consume any appreciable period of time, if any. If an appeal is not now taken and allowed, it will be necessary for a full and complete trial of all of the other issues remaining in the cases and in particular it will be necessary for each libelant to proceed to prove the damages which are claimed despite the ruling of this court respecting the limitation of liability. Under these circumstances, it may well be anticipated that these trials will exceed all-told at least 100 days. Furthermore, many of the litigants are the wives and dependents of servicemen who, perhaps, are not financially able to afford the trials of these cases, particularly if in the end it is determined that the limitation of liability applies.

It appears to this court that this is an interlocutory decree determining the rights and liabilities of the parties in an admiralty case from which is an allowable appeal. See Rice Growers Ass'n v. Rederiaktiebolaget Frode, 171 F.2d 662 (9 Cir., 1948). This court shall, pursuant to Section 1292 of Title 28, U.S.C.A., certify and state in its order that the order in this case involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation and may expedite the conclusion of the cases in the interest of justice.

A stay of proceedings will be ordered pending the application for an allowance of an appeal to the Court of Appeals.