Bates **BLOCK** et al., **Appellants,**

v.

**COMPAGNIE NATIONALE AIR FRANCE, Appellee.**

No. 21609.

United States Court of Appeals
Fifth Circuit.

Nov. 8, 1967.

William H. Schroder, Atlanta, Ga., Lee S. Kreindler, New York City, for appellants.

E. Smythe Gambrell, Harold N. Hill, Jr., Atlanta, Ga., for appellee.

Before JONES and WISDOM, Circuit Judges, and BREWSTER, District Judge.

WISDOM, Circuit Judge:

June 3, 1962, an Air France Boeing 707 jet liner beginning the final leg of an Atlanta-Paris-Atlanta "Jet Trip to the

Louvre" crashed at Orly Field, Paris, France. Everyone aboard was killed. The 122 passengers were all members of the Atlanta Art Association. February 2, 1962, the association had entered into an "International Charter Flight Agreement" with Air France for the airline to furnish the plane for the flight at the cost of $36,000.

The plaintiffs instituted forty-five actions against Air France for the deaths of sixty-two of the passengers. These actions were consolidated under Fed.R. Civ.P. 42(a) for a determination of liability, separate trials to be held on the issue of damages.

Air France asserts three defenses: (1) that the flight was governed by the Warsaw Convention, ratified and adhered to by the United States, limiting recovery to a maximum of $8291.87 for each person killed; [1] (2) that the contract of carriage (as set forth in the Charter Flight Agreement or in the ticket or in both) explicitly incorporates by reference the Warsaw limitation; (3) that the law of France, where the accident occurred, governs the case, and under French law the Warsaw limitation is applicable.

■ The plaintiffs contend that the Warsaw Convention does not apply to charter flights.[2] Accordingly, they filed a

1. The Warsaw Convention, officially entitled "A Convention for the Unification of Certain Rules Relating to International Transportation by Air" was signed by the representatives of 23 countries at Warsaw, Poland, October 12, 1929. About ninety countries now adhere to it. The United States did not participate in the Conference. June 15, 1934, however, the United States Senate advised adherence to the Convention and October 29, 1934, President Roosevelt proclaimed adherence. See 49 U.S. Stat. at L. 3000–3026, p. 3013 (1935).

November 15, 1965, the State Department delivered a Notice of Denunciation of the Convention to the Polish Government, effective May 15, 1966. Dept. State Press Release No. 268, Nov. 15, 1965; see N.Y. Times, Nov. 16, 1965, p. 82, col. 1 (city ed.). May 14, one day before the denunciation was to become effective, the United States withdrew its notice of denunciation with the announcement that the Civil Aeronautics Board had approved an agreement between the United States and the large majority of international air carriers, increasing the limits of international air carrier liability from $8,300 to $75,000. Dept. State Press Release No. 268, Nov. 15, 1965. The Convention, as supplemented by the agreement, remains in effect pending the establishment of more permanent arrangements between the governments. Air France signed the agreement but too late to affect the parties in this case.

2. The plaintiffs here do not contend that the decedents failed to receive proper delivery of the tickets or proper notice of the Warsaw limitation of liability.

For limitation of liability to apply, the passenger's ticket must state that the flight is subject to the provisions of the Convention. Art. 3(2); Art. 3(1) (e).

The ticket must be delivered in time and in such a manner as to enable a passenger to take out insurance. Mertens v. Flying Tiger Lines, Inc., 2 Cir. 1965, 341 F.2d 851; Warren v. Flying Tiger Lines, Inc., 9 Cir. 1965, 352 F.2d 494. The Second Circuit has recently held that the Convention requires not only delivery of the ticket (Art. 3(2)) but actual notice of the limitation (Art. 3(1) (e)); liability limitations in "Lilliputian print in a thicket of 'conditions of Contract' " frustrates the purpose of the delivery requirement. Lisi v. Alitalia-Linee Aeree Haliane, S.p.A., 1966, 370 F.2d 508, cert. granted, 387 U.S. 901, 87 S.Ct. 1687, 18 L.Ed.2d 620. By agreement among 28 American and foreign airlines, each passenger must now receive a notice printed in ten-point type advising him of the liability limitations. CAB Press-Release, No. 66–61; 382–6031, May 31, 1966. In November 1961 The Atlanta Art Association began working with the American Express Company to arrange a charter flight to Paris. The charter, executed February 2, 1962, provides: "Carriage furnished herein is subject to the rules relating to liability established by the [Warsaw] Convention. * * * Charterer declares that he has taken note of the provisions of said tariffs, conditions of carriage and rules and regulations, and undertakes to bring the notice of passengers and shippers participating in the charter flight under this Agreement." The tickets, each containing similar language and each marked "Chtr Contract", were delivered to the passenger on April 17, 1963, three weeks before the departure May 9 and six weeks before the accident. See generally Lacey, Recent Developments in The Warsaw Convention, 33 J. Air L. & Com. 385, 393 (1967).

motion for a partial summary judgment under Fed.R.Civ.P. 56 seeking a judgment dismissing and striking each part of the defenses that asserts the applicability of the Convention. The district court denied the motion. Block v. Compagnie Nationale Air France, N.D.Ga. 1964, 229 F.Supp. 801. The court found:

"Under the terms of the Charter Flight Agreement Air France furnished all the crews, fuel, etc.; and no passenger was to be carried unless such passenger had been issued a ticket by Air France. The International Charter Agreement was made subject to the approval of the Civil Aeronautics Board. * * * From the evidence now presented, it appears that there are no substantial differences as to the facts surrounding the arrangements of the 'Jet Trip to the Louvre'."

The court correctly limited the issue:

"This Court heretofore, in various hearings, has noted that there are various possible arrangements by which a charter flight might be made and the question therefore is not 'Does the Warsaw Convention apply generally to charter flights', but the question is 'Does the Warsaw Convention apply to this particular charter flight?'"

The court held:

"[U]nder the factual situation in the cases at hand * * * where Air France, the air carrier, owns, operates, and controls the aircraft and, prior to departure, delivers proper tickets to the passengers for their passage, the Warsaw Convention would be applicable, and the passenger or passengers would be entitled to the presumption of liability contained in the Warsaw Convention as against Air France, and Air France, the air carrier, would be entitled to the limitation of liability also contained in the Convention as against the passengers."

 We affirm. The Warsaw Convention applies to the international transportation of passengers under a contract of carriage on a "voyage" charter flight. The plaintiffs' recovery of damages in the instant cases therefore is limited to the amount allowed by that treaty. We find it unnecessary to pass upon Air France's other defenses.

## I.

At the time the Warsaw Conference was held, October 1929, civil aviation was in its infancy.[3] Lindberg had flown the Atlantic only two years before. The sole international air carrier in the United States operated flights between Havana and Key West.[4] The United States declined an invitation to attend the Conference, although it sent two observers, John Ide and McCeney Werlich.

The Warsaw Convention was the result of extensive preparatory work, commencing with the first Conférence Internationale de Droit Privé Aérien, held in Paris in 1925. The Paris Conference appointed a committee of experts in international air law, the Comité Internationale Technique d'Experts Juridique Aériens (Citeja), officially translated in United States documents as "International Technical Committee of Aerial Legal Experts". Citeja has had primary re-

---

3. "The total airline operations in the five-year period 1925 to 1929—in domestic as well as foreign travel—were only 400 million passenger miles. The fatality rate was 45 per 100 million passenger miles. This compares with the rate of 0.55 fatalities per 100 million passenger miles in 1965. 1965 Annual Report of the ICAO Council to the ICAO Assembly 13. The larger airliners could carry 15 to 20 passengers at cruising speeds of about 100 miles per hour and over stages of about 500 miles. The most advanced and popular United States aircraft, the Lockheed Vega, which carried six passengers and a pilot, had a cruising speed of about 120 miles per hour and a range of about 500 miles. * * *" Lowenfeld and Mendelsohm, The United States and the Warsaw Convention, 80 Harv.L.Rev. 497, 498 (1967).

4. Wright, The Warsaw Convention's Damage Limitations, 1957 Clev.-Mar.L.Rev. 290–91.

sponsibility for preparing draft conventions submitted to various conferences on international air transportation.[5] American observers were present at the Paris Conference and at meetings of Citeja during the years 1927 through 1930. From 1931 on, the United States appointed official representatives to Citeja. The Paris Conference prepared a preliminary draft convention on the liability of air carriers and assigned certain topics for further study to Citeja. One of these topics was "location des aéronefs", a generic term meaning the hiring and renting and, sometimes, chartering of airplanes.[6]

The Conference achieved its two primary objectives: (1) uniform rules relating to air transportation documents (passenger ticket, baggage check, and air waybill); (2) limitation of the carrier's liability for an airplane accident. In accomplishing the second objective, the Conference recognized the need for a quid pro quo by establishing a presumption of the carrier's liability, thereby shifting the burden of proof from the passenger to the carrier. (Article 20.[7]) Secretary of State Cordell Hull, in trans-

mitting the Warsaw Convention to the United States Senate in 1934, explained:

"It is believed that the principle of limitation of liability will not only be beneficial to passengers and shippers as affording a more definite basis of recovery and as tending to lessen litigation, but that it will prove to be an aid in the development of international air transportation, as such limitation will afford the carrier a more definite and equitable basis on which to obtain insurance rates, with the probable result that there would eventually be a reduction of operating expenses for the carrier and advantages to travelers and shippers in the way of reduced transportation charges. * * * The principle of placing the burden on the carrier to show lack of negligence in international air transportation in order to escape liability, seems to be reasonable in view of the difficulty which a passenger has in establishing the cause of an accident in air transportation." [8]

## II.

On its face, the Warsaw Convention seems to cover all international carriage by air, without any limitation whatever.

5. See Ide, The History and Accomplishments of the Citeja, 3 J. Air L. & Com. 27 (1932). Mr. Ide was the United States observer at Citeja (1929–31) and at the Warsaw Conference.

6. The plaintiffs and the defendants dispute the translation of "location des aéronefs". The literal meaning is "hiring of aircraft". The plaintiffs' translator, who was also used by the defendant, translated the term as "chartering of aircraft". Later, by affidavit, he averred: "The most accurate translation of the French word 'location' into English is 'hiring', 'leasing' or 'renting' * * *. Correct and proper translation of the French word 'location' is not 'chartering'." However, in the legislative history of the Warsaw Convention, the term was sometimes used to include chartering and sometimes used interchangeably with "affrètement" (chartering) and "charte" (charter). British Regulations define "charter service" as air transport service "under a contract of hire". Civil Aviation (Licensing) Regulations, 1960, No. 2–2. The Civil Aeronautics Board defines "charter trip" as "air transpor-

tation performed by an air carrier * * * where the entire capacity of one or more aircraft has been engaged for the movement of persons * * * or * * * property on a time mileage or trip basis". Title 14, Part 207, E R–419, 29 F.R. 13249, Sept. 24, 1964.

7. Article 20. Exemptions.
 (1) The carrier shall not be liable if he proves that he and his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures.
 (2) In the transportation of goods and baggage the carrier shall not be liable if he proves that the damage was occasioned by an error in piloting, in the handling of the aircraft, or in navigation and that, in all other respects, he and his agents have taken all necessary measures to avoid the damage.

8. Senate Comm. on Foreign Relations, Message from the President of the United States Transmitting a Convention for the Unification of Certain Rules, Sen. Exec. Doc. No. G, 73d Cong., 2d Sess. 3–4 (1934).

A. Article 1(1) states the scope of the treaty:

"This convention shall apply to *all international transportation* of persons, baggage, or goods performed by aircraft for hire. It shall apply equally to gratuitous transportation by aircraft performed by an air transportation enterprise." (Emphasis added.)

Article 1(2) defines "international transportation":

"For the purposes of this convention, the expression 'international transportation' shall mean *any* transportation in which, according to the contract made by the parties, the place of departure and the place of destination, whether or not there be a break in the transportation or a transshipment, are situated either within the territories of two High Contracting Parties, or within the territory of a single High Contracting Party, if there is an agreed stopping place within a territory subject to the sovereignty, suzerainty, mandate or authority of another power, even though that power is not a party to this convention."

The district judge found Article 1 so clear that he concluded, "[T]he language contained in the Warsaw Convention is not ambiguous, and [the court] deems it unnecessary to resort to a discussion of the legislative history of the Treaty."

B. The Convention makes only three exceptions to the wide sweep of Article 1. None covers this Air France charter flight. First, Article 2(2) excludes "transportation performed under the terms of any international postal convention". Second, Article 34 excludes "international transportation by air performed by way of experimental trial by air navigation enterprises with the view to the establishment of regular lines of air navigation". Third, Article 34 also excludes "transportation performed in extraordinary circumstances outside the normal scope of an air carrier's business." [9]

The third exception is the only one that, arguably, might encompass the Air France flight. This provision, however, was intended from the start to have a very narrow application. In placing the draft convention before the conference, Henri De Vos of Belgium, Rapporteur of the Conference, gave as an example of an "extraordinary" situation a rescue mission sent to pick up passengers and baggage from an earlier flight that had been forced down. He described such a rescue flight as one that "could not be made under normal conditions." [10] Professor Georges Ripert, delegate from France, author of Article 34, explained that in such exceptional circumstances certain requirements established by the Convention, such as the delivery of a passenger ticket and baggage check, could not be observed.[11] Several delegates complained that this provision would open a dangerous loophole in the Convention.[12] To allay their fears, Professor Ripert stressed that this exception was not a broad loophole.[13] Just before the conference was to take a final vote on Article 34 Amedee Giannini, head of the Italian delegation, who had cautioned Ripert earlier about the dangers inherent in the

---

9. This is an instance where the English translation is awkward and it is helpful to read the provision in the original French version: "La présente Convention n'est applicable * * * aux transports effectués dans des circonstances extraordinaires en dehors de toute opération normale de l'exploitation aérienne." "The relation", Sundberg and others have pointed out, "is there not to the particular type of business carried on by one carrier, but to the general nature of aerial exploitation". See Sundberg, Air Charter: A Study in Legal Development 261 n. 83 (Stockholm 1961), made part of the record below.

10. II Conférence Internationale de Droit Privé Aérien, Oct. 4–12, Warsaw, Procés-Verbaux p. 58.

11. Ibid.

12. See statements by Sir Alfred Dennis of Great Britain, id. at 58, and Sabanine of Russia, id. at 58.

13. See the interchange between Ripert and Giannini of Italy, id. at 58.

provision,[14] emphasized the narrowness of the provision.[15]

The parties to the treaty and their delegates to the Conference were well aware that the Convention was to apply to a developing industry. See Section IV C of this opinion. Although charter flights such as the one before us might once have been rare, they were never extraordinary in the sense that they were "outside the normal scope of an air carrier's business".[16] Night flights and transatlantic flights were "exceptional" in 1929, and jet flights unknown, but there is no question as to the applicability of the Warsaw Convention to a transatlantic jet flight at night.

C. Had the Warsaw framers intended to create an exception for charter flights it is difficult to see why they did not include a specific provision in the Convention, such as they did in Article 2(1) for flights conducted under the terms of any international postal convention and in Article 34 for experimental or extraordinary flights. There is no valid reason to except *all* charter flights. In some charters, perhaps, the responsibility is so divided as to create a problem in determining who is the carrier for purposes of the Convention, but where this problem does not exist, as in a voyage charter where the owner (airline) is also the operator, there is no practical difference between a charter flight and an ordinary scheduled commercial flight.

[4] Looking to the realities rather than to traditional concepts, which vary from country to country, air charters may be divided into basic types.[17] (1) In a "bare-hull", "hire", or "lease" charter the owner (airline) merely supplies a plane, without a crew, to a charterer, who may use it where and when he pleases; the charterer furnishes the crew and pays the expenses of operating the aircraft. (2) In a "time charter" the airline provides the charterer with an equipped plane and crew for a specific period of time to use as the charterer wishes. (3) In a "voyage charter" the owner charters his fully equipped plane and crew for a predetermined voyage. In a voyage charter, such as that entered into by Air France and the Atlanta Art Association, the owner controls and operates the aircraft. In effect, the middleman is eliminated, except for purposes of negotiating the charter. Although there are these three basic types of air charters, somewhat analogous to maritime charters, the degrees of control, discretion, and responsibility of the charterer can vary enormously from case to case, from the extreme bare hull charter arrangement in which the airline relinquishes total control all the way to the charter in this case where the charterer's role is totally unconnected with the physical op-

---

14. Id. at 58.

15. Id. at 145.

16. "As early as 1933, Blanc-Dannery pointed out that air taxi flights were not properly in the Article 34 category of operations. 'Toutes les compagnies aériennes, à la demande d'un client, le font conduire à l'endroit où il désire. On ne peut dire que ce sont des transports réguliers et pourtant ils rentrent bien dans le cadre de l'exploitation aérienne normale.' La Convention de Varsovie et les régles due transport aérien international, thése Paris 1933 p. 20. What was true of air taxi flights in 1933 is certainly true of charter flights today. Whatever the type of the air commerce contract, success and volume business exclude the application of Article 34."

Sundberg, Air Charter: A Study in Legal Development 261–262 (Stockholm 1961). See also Coquoz, Le Droit Privé Internationale Aérien 165 (Paris 1938). "The whole question of the application of Article 34, furthermore, under the Hague Protocol loses interest. This Protocol provides that as to cases properly fitting under Article 34, it is not the whole of the Convention that is excluded, but only Articles 3 to 9 of the documentary chapter." Sundberg 263.

17. The three categories of charter are widely recognized, Grönfors, Air Charter and the Warsaw Convention 15–16 (Martinus Nijhoff, The Hague 1956); Drion, Limitation of Liabilities in International Air Law (The Hague 1954); Sundberg.

eration of the flight. If the points of departure, stopping places, and destination of a flight are not stated in a charter, the charter flight would not come within Article 1(2). But there is nothing in Article 1 or in any other article in the Convention that would bar applicability of Warsaw to a voyage charter of the kind entered into between Air France and the Atlanta Art Association.

■■ D. The title of the Convention is modest. It purports to apply only to *certain* rules relating to air transportation. As Sundberg observes, therefore: "On points not covered by unified rules [of the Convention] one would then expect to find conflicts of law rules. The Warsaw Conference, however, agreed upon conflicts of laws provisions only in five special cases. . . . The discrepancy is explained by the utter hostility which was displayed by the Conference relating to conflicts of laws solutions." [18] With this "basic tenet" in mind, the Conference drew the Convention "in French in a single copy". (Article 36.) The Statutes at Large for 1934 indicate that it was the French text to which the United States adhered in the instrument the United States deposited in the archives of the Ministry for Foreign Affairs of Poland. 49 Stat. 3013 (1934).[19] The binding meaning of the terms is the French legal meaning. "The principle of the primacy of the French legal system thus means a harmonizing construction of the Convention." This principle should not be carried to extremes, but "[u]niformity may be maintained without many futile disputes as to whether, why, and when resort to the teachings

in Paris should be made." The necessity for maintaining uniformity, even when the Convention is applied in a country, such as the United States, having a doctrinal basis for its legal system different from civilian systems, compels a broad construction of the Convention.

### III.

The Warsaw Convention does not expressly mention charters or charter flights. The plaintiffs argue that even if there is no specific provision excepting the charter flights from the coverage of the Warsaw Convention, the Convention, still does not apply to the Air France-Atlanta flight because coverage is premised upon a direct contractual relationship which, the plaintiffs contend, does not exist here. The gist of this argument is that Article 1 refers only to "transportation * * * according to *the* contract" between the parties; that the Warsaw Convention assumes the existence of an ordinary two-party contract of carriage between the airline and the passenger; that since this flight resulted from a charter between Air France and the Atlanta Art Association, the requisite contractual relationship between the airline and the passengers does not exist.

The applicability of the Convention undeniably is premised upon a contract, but on a contract of a particular kind. It is based on a contract of carriage that arises from the relationship between a "carrier" and the passengers.[20] This contractual relationship requires only that the carrier consent to undertake the international transportation of the passen-

18. The quotations in this paragraph are from Sundberg 242–249.

19. However, on June 15, 1934, the text that was read to the Senate, and to which the resolution of ratification was directed, was a text in English originally published in a Treaty Information Bulletin of the Department of State in March 1934. 78 Cong.Rec. #115 77–82 (1934).

20. Lureau, La Responsabilité du Transporteur Aérien 84 (Paris 1961); Cal-kins, The Cause of Action Under the Warsaw Convention, 26 J. Air L. & Com. 217, 219–20 (1959); Riese and Lacour, Précis de Droit Aérien 233 (Paris 1951); Goedhuis, National Airlegislations and the Warsaw Convention 123 (The Hague 1937); Sullivan, The Codification of Air Carrier Liability by International Convention, 7 J. Air L. & Com. 1–2 (1936); Coquoz, supra note 16, at 68, 99.

ger from one designated spot to another,[21] and that the passenger in turn consent to the undertaking. In a charter situation the passenger's cause of action under the Warsaw Convention is based on this contract of carriage (the sale and purchase of transportation), not on any tort theory.

We look now to the role contract plays *in achieving the objectives of the Conference.* We note, in passing, that the underlying concepts are civilian in origin and that much of the difference in views among the jurists on Citeja and the delegates to Warsaw is attributable to the conceptual differences in the laws of France, Italy, Germany, and the Scandinavian countries,[22] to say nothing of the difference between the civil law and the common law.

A. *It is clear that the framers did not intend to endorse or encourage bargain-*

21. "The draftsmen of the Convention intended to create a right of action based on the contract of carriage, * * * Even a cursory reading of this text will convince the reader that the French law of contractual liability of the carrier was intended to be the governing basis of the convention. Thus Article 21 establishes the period during which the convention is to apply. * * * Article 26 also demonstrates that a contractual right of action under the convention was intended. The first clause of the paragraph reads—'in case of accident, loss, damage or delay, the liability action may not be instituted against the carrier except *on the basis of this convention.*' (Emphasis supplied). Outside rights in tort were excluded subject to one exception. This is found in the material which immediately follows in draft Article 26. Today we *refer to it* as the *'willful misconduct'* provision, which makes inapplicable only such provisions of the Convention as exclude or limit liability. In this draft, however, it was quite clear that all claims were to be under the convention unless the damage arose from an intentional and illegal act as to which the carrier was liable. In short, actions arising out of willful misconduct of a carrier were to be based on national law rather than on the contract. * * * The goal of unification was sought with unremitting zeal—that the intent was to supply that unification by a contractual right of action under which liability was not to be absolute in case of non-performance, but measured by the negligence of the carrier." Calkins, supra note 20, at 217, 218, 223, 236.

The Code Civile of France defines a contract simply:

"Art. 1101. Le contrat est une convention par laquelle une ou plusieurs personnes s'obligent, envers une ou plusieurs autres, à donner, à faire ou à ne pas faire quelque chose." ("A contract is an agreement by which one or several persons bind themselves towards one or several other persons to give, to do, or not to do a certain thing." Cachard tr.)

"Art. 1108. Quatre conditions sont essentielles pour la validité d'une convention:
Le consentement de la partie qui s'oblige;
Sa capacité de contracter;
Un objet certain qui forme la matiére de l'engagement;
Une cause licite dans l'obligation." ("Four conditions are essential to the validity of a contract:
The consent of the party who binds himself;
His capacity to contract;
A special object forming the substance of the agreement;
A licit cause for the obligation." Cachard tr.)

22. There may be as great a difference between the laws of France and Italy as between the laws of France and the United States. Generally speaking, the civilian countries, whether or not by codified law, have tended toward defined categories of contracts. The term "charter" is not a civilian term. It may designate a variety of innominate legal relationships which do not fit very well into classic civilian categories. If a charter is a lease, the lessee (charterer) has the burden of tort liability; if it is a contract of carriage, the carrier has the burden. See Riese, Luftrecht 408 (1949); Sundberg 136.

According to the law of France and of many countries negligence in carriage is not tortious harm but a contractual breach. "Contractual liability is founded in the non-performance of the obligations flowing from the contract of air transport in which third persons have or possess the status of simple contracting parties and the carrier undertakes to carry the passengers or merchandise with absolute security throughout the journey. Such obligation even without being specifically stipulated subsists, and in case of non-performance places the carrier in

ing between the parties.[23] The Convention assumes the passenger's inadequate ability to bargain.[24] The Conference debates contain many allusions to the bargaining weakness of the passenger.[25] Within the context of the Convention the only issue which the parties are permitted to negotiate is the *raising* of the liability limitation, and here the Convention does not refer to "the contract" as it does in thirteen other provisions but rather speaks of a "special agreement" or, in the original and official French version, a "convention spéciale".[26]

Since the Convention does not anticipate bargaining between the two primary parties, it does not limit participation in the negotiation of the contract to these two parties.[27] Thus the Convention refers to the existence of a contract in many places, but it never once describes this contract solely in terms of the passenger and the carrier. There is no Warsaw objection therefore to a third person acting as agent of passengers or entering into a contract with the carrier for the benefit of passengers ("stipulation pour autrui").

The plaintiffs make much of the fact that Article 1(2) does contain a reference to "*the* contract made by the parties". But this reference is in a provision defining "international transportation", for purposes of the Convention, as being dependent upon the places of departure and arrival agreed to by the parties. The object of this requirement is that the applicability of the Convention to the flight be known in advance and not be dependent upon the place where the plane might happen to crash-land. In its English translation Article 1(2) reads as follows:

(2) For the purposes of this convention, the expression "international transportation" shall mean any transportation in which, *according to the contract made by the parties*, the place of departure and the place of destination, whether or not there be a break in the transportation or a transshipment, are situated either within the territories of two High Contracting Parties, or within the territory of a single High Contracting Party, if there is an agreed stopping place within a

the role of a contractual debtor and the passenger as his creditor." Rigalt, Principios de derecho Aero 124 (1939). See Calkins, supra note 20; note 22.

**23.** Articles 1(2), 1(3), 3(2), 4(4), 5(2), 11(1), 12(1), 14, 18(3), 22(1), 23, 28 (1), 30(1), 32, 33.

**24.** See Article 23: "Any provision tending to relieve the carrier of liability or to fix a lower limit than that which is laid down in this convention shall be null and void, but the nullity of any such provision shall not involve the nullity of the whole contract, which shall remain subject to the provisions of this convention."

**25.** See, for example, the comment of Georges Ripert of France: "Well, then, in reality, this convention creates, against the air carrier, an exceptional regime, for, in most of the countries of the world, the contracts of transport are concluded under the regime of freedom. The carrier is free to insert in the contract clauses which exclude or diminish his responsibility, for merchandise as well as for passengers. You can imagine that

they did not fail to do it, and presently many aerial navigation companies operate under this regime of contractual freedom and, in practice, in fact, they are not liable." II Conférence Internationale 32–33.

See also statements by Sabanine of Russia, p. 27; Riese of Germany, p. 85; Ripert, pp. 86–87.

**26.** Article 22(1): "Toutefois par une convention spéciale avec le transporteur, le voyageur pourra fixer une limite de responsabilité plus élevée."

**27.** "One must consider as an airplane passenger the person whom the carrier has engaged, by means of a contract of transportation, to carry from one place to another on an airplane. Thus, the stowaway could never be termed a passenger * * * and demand that the Warsaw Convention be applied. *It is not indispensable that the passenger have figured personally as a contracting party. The contract could have been concluded in his favor by a third party.*" See Coquoz, supra note 16, at 87. (Emphasis supplied.)

territory subject to the sovereignty, suzerainty, mandate or authority of another power, even though that power is not a party to this convention. Transportation without such an agreed stopping place between territories subject to the sovereignty, suzerainty, mandate, or authority of the same High Contracting Party shall not be deemed to be international for the purposes of this convention. (Emphasis added).[28]

This is a poor translation of the original and official French version, which also states that both parties need agree to the stopping places but which does not assert or imply that this agreement need be made as part of a single and direct contract. Instead of the language, "according to the contract made by the parties", the French version reads "d'après les stipulations des parties". Thus the French version refers to the *stipulations* (conditions) agreed to by the parties rather than to *"the contract* made by the parties". The French version therefore would include the situation where both main parties agree to the same route but

do so through a third party such as the Atlanta Art Association.

It is also clear that by referring to a contract the Convention does not intend to establish the prerequisite that consideration, *in a common law sense*, must flow both ways between the two parties before their relationship can come under the Convention's control. Even if the passenger should make no promise to pay there would still be a contract of transportation, supported by cause, *in a civilian sense.*[29] Article 1(1) explicitly declares that the Convention "shall apply equally to gratuitous transportation by aircraft performed by an air transportation enterprise." [30] Therefore, all that is needed to establish the requisite contract is a promise, an undertaking, on the part of the carrier to transport the passenger, and the consent of the passenger.

The contract plays a role fundamental to the objectives of the Warsaw Conference. The obligations arising from the contract between the carrier and the passenger carry out the Conference goal that the rules of limited liability be known

**28.** "2) Est qualifié 'transport international', au sens de la présente Convention, tout transport dans lequel, *d'après les stipulations des parties*, le point de départ et le point de destination, qu'il y ait ou non interruption de transport ou transbordement, sont situés soit sur le territoire de deux Hautes Parties Contractantes, soit sur le territoire d'une seule Haute Partie Contractante, si une escale est prévue dans un territoire soumis à la souveraineté, à la suzeraineté, au mandat ou à l'autorité d'une autre Puissance même non Contractante. Le transport sans une telle escale entre les territoires soumis à la souveraineté à la suzeraineté, au mandat ou à l'autorité de la même Haute Partie Contractante n'est pas considéré comme international au sens de la présente Convention." Cf. "Paragraph 2 of article 1, in its reference to 'the contract made by the parties' means, obviously and on its face, not that the Convention applies only when the parties contract for its application, but that it applies (unless by special arrangement otherwise) whenever, 'according to the contract made by the parties,' the place of departure and the

place of ultimate destination are within the territories of two of the 'High Contracting Parties' or both within the territory of a 'single High Contracting Party' with certain agreed stopping places elsewhere. Put another way, that means that the Convention becomes the law of the carriage when the 'contract' of the parties provides for passage between certain described termini. When such is the contract, then the Convention has *automatic full impact, by its own* terms and not because the parties have so agreed." Ross v. Pan American Airways, 1949, 299 N.Y. 88, 85 N.E.2d 880, 885, 13 A.L.R.2d 319.

**29.** "In gratuitous contracts, the intention to exercise an act of liberality or to *render a service, constitutes a sufficient* cause of engagement". Aubry and Rau, Cours de Droit Civil Francais IV, Obligations, § 345 (6th ed. La.L.Inst. tr. 1965).

**30.** The object was to exclude the application of the Convention to casual, isolated flights when a free ride is afforded by an owner not engaged in the business (enterprise) of flying.

to both parties.[31] This knowledge enables the passenger to determine in advance the amount of insurance he needs;[32] permits the carrier's insurer to gauge the carrier's long-term risk, and act accordingly;[33] and, finally, advises the carrier as to what law it need conform its transportation documents. This rationale—that the flight arrangements must be based upon an agreement because only in that way can the necessary knowledge or foreseeability be achieved—implies that as long as there exists an agreement between the carrier and the passenger as to transportation and as to places of *departure* and *arrival,* any agreement between the owner-carrier and a third person, the charterer, is irrelevant to Warsaw purposes.

The common demoninator of all Warsaw contracts of carriage is the consent of the carrier to transport the passenger (or goods) and the consent of the passenger (or shipper) that the transport take place. "The contract of carriage represents the sale and purchase of transportation of persons and goods, i. e. an obligation to carry passengers or goods from one place to another."[34] For this reason a stowaway injured in a plane accident may not recover against the carrier under the Warsaw Convention.[35] This fundamental role of consent as a prerequisite to the conclusion of a contract of transportation is emphasized in the Convention by Article 33: "Nothing contained in this convention shall prevent the carrier * * * from refusing to enter into any contract of transportation."

■ To sum up, for a flight to come within the scope of the Warsaw Convention, the carrier must have agreed to carry the passenger, and both the carrier and the passenger must have consented to the particular route. If the carrier is an "air transportation enterprise" the passenger need not have paid or have promised to pay, provided that the carrier has consented to transport the passenger under those conditions. Finally, the passengers and the airline need not have been in a position where they could bargain over the terms of carriage.

■ The existence of the airline-passenger relationship is not destroyed by the fact that a third party negotiated the agreement and signed the charter. A fortiori, the airline-passenger contract exists when the negotiator is only a nominal party, acting on behalf of the passengers.[36] Nor is the airline-passenger re-

---

31. "It is the will of the parties, and not the route actually taken by the plane, which constitutes the determinative element for the classification of the flight. This prescription possesses, for the parties involved, the appreciable advantage of settling in advance the application of the Warsaw Convention, thus becoming independent of fortuitous events. Coquoz, supra note 16, at 95.

See also Grein v. Imperial Airways, Ltd., Ct.App.England 1936, 1 Avi. 622, 635; Calkins, supra note 20, at 262; Juglart, Traite Elementaire de Droit de Aérien 319 (Paris 1952); Goedhuis, supra note 20, at 21; Sullivan, supra note 20, at 6.

32. See Lisi v. Alitalia-Linee Aeree Italiana S.p.A., 2 Cir. 1966, 370 F.2d 508, cert. granted, 387 U.S. 901, 87 S.Ct. 1687, 18 L.Ed.2d 620; Warren v. Flying Tiger Line, 9 Cir. 1965, 352 F.2d 494, 497; Mertens v. Flying Tiger Line, 2 Cir. 1965, 341 F.2d 851, 856–857. Cf. Gardner, Some Legal Advice: So you're going to fly to London, 43 A.B.A.J. 412 (1957).

33. Report of the Secretary of State, Cordell Hull, to the President of the United States, Franklin Delano Roosevelt, 1934 U.S. Av.Rep. 240, 242; Ide, The History and Accomplishments of the International Technical Committee of Aerial Legal Experts (C.I.T.E.J.A.), 3 J. Air L. & Com. 27, 29–30 (1932).

34. Grönfors, Air Charter and the Warsaw Convention 60 (The Hague 1956). See also Riese, supra note 22, at 246–47.

35. Riese, supra note 22, at 233; see note 27.

36. The plaintiffs contended below that there must be a direct contractual relationship between the carrier and the passengers for the Convention to be applicable. Article 8(f) of the charter describes the Association as acting "on his own behalf and as duly authorized agent of all passengers". Judge Lewis R. Morgan held that: "No such direct contractual relationship is required by the Convention, and in any event the direct contractual relationship existed here. ¶ The

335

lationship destroyed by the fact that in certain circumstances and in accordance with the law of certain countries, the charterer may be treated as the carrier in determining *its* liability.

B. The fatal flight developed out of three sets of contractual relationships: first, the relationship between Air France and the Atlanta Art Association, created by their "International Charter Flight Agreement"; second, the more informal set of relationships between the Art Association and the individual passengers; and third, the relationships between the individual passengers and Air France, concluded by the airline's delivery to each passenger of a personal ticket for the flight.

The initial arrangements for the charter flight were made in the "International Charter Flight Agreement" dated February 2, 1962, and the supplementary "Schedule A" dated January 8. At the heart of these two documents was an agreement for Air France to furnish a Boeing 707 jet with a 140 passenger capacity in return for a payment by the Art Association of $36,000. The flight was scheduled to leave for Paris May 9, 1962. The Art Association had the right to cancel the contract unconditionally up to 25 days before that date. If the Association cancelled after that date, it would have to pay Air ▮▮▮▮ a cancellation fee of $3,600, ten per cent of the charter fee. Air France had the right to cancel at any time, subject only to the duty to return that portion of the fee equal to the proportion of the miles not flown.

Under the terms of the agreement the Art Association had no control over the physical conduct of the flight; anything concerning the operation of the plane was the responsibility of Air France.[37] Although the Art Association was to obtain the passengers for the flight, its choice of passengers in no way bound Air

provision of the International Charter Flight Agreement that the charterer acted as agent for the passengers was required by the CAB pursuant to statute. * * * [T]he Atlanta Art Association, an association not engaged in transportation directly or indirectly, could obtain group rate transportation for its members, if the charter is made by the Association as an agent or representative of such group. The CAB required that such a charterer act as agent for the passengers, and the Flight Agreement in this case was made in compliance with that rule of the CAB. Without such an arrangement, under its rules, the CAB would have disapproved the Charter Flight Agreement here involved. * * * When the Atlanta Art Association, through its president, executed the International Charter Flight Agreement as agent for the passengers, a direct relationship arose between Air France and each passenger." 229 F.Supp. at 806.

37. "Article 3. Costs. All expenses for fuel, oil, crew salary and crew expense and landing fees for the aircraft will be for the account of AIR FRANCE. All other expenses in connection with the charter flight, including transportation sold thereon, costs for visas, customs inspection fees, customs duties and other taxes payable in connection with the passengers, baggage and cargo transported, shall be for the account of the Charterer. * * *

"Article 4. Operation, Interruption or Cancellation of Flight. (a) AIR FRANCE shall have exclusive control over the aircraft chartered hereunder and reserves the rights, in its sole discretion, to determine the route to be flown and airports to be used; to limit, for operational reasons, the number of passengers and the weight, size, type, contents and value of baggage and cargo. * * * (c) The captain of the aircraft shall have complete discretion concerning the load carried and its distribution and the manner of its stowing and discharge, as to whether or not a flight should be undertaken, and as to where landing should be made and the Charterer shall accept as final all such decisions of the captain, but neither the captain nor AIR FRANCE shall incur any liability as a result of the exercise of such discretion. (d) The operating personnel are the servants or agents of AIR FRANCE and shall remain at all times under the exclusive control of AIR FRANCE. They are authorized to take orders only from AIR FRANCE unless specific agreements have been made in writing between the parties hereto whereby they may accept certain defined instructions from charterer."

France.[38] Thus even if a person had paid the Art Association the price of the full fare, that person had no right to a place on the flight. That right came into being only by the act of Air France in issuing, in the passenger's name, an ordinary airline ticket. The ticket itself was not the contract but its issuance evidenced the contractual relationship between the passenger and Air France.

The charter agreement contained the following provision:

"Article 8. Liability

(a) Carriage furnished herein is subject to the rules relating to liability established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air, signed at Warsaw, Poland, October 12, 1929 (hereinafter called 'Warsaw Convention'), unless such carriage is not 'International Carriage' as defined by said Warsaw Convention."

Essentially the same provision was contained in the boiler plate "conditions of contract" on the reverse side of each "ticket". In Article 6 of the agreement Air France agreed that it would "be bound by the terms and conditions of said AIR FRANCE tickets". The provision further states that the tickets created a direct cause of action in the passengers against Air France. "Any action taken by Charterer with respect to said tickets * * * shall be deemed to be taken as agent for the passenger. * * *" Before the tickets were issued, and despite the existence of the charter agreement, Air France had no obligation to carry any individual passenger.

The contractual relationship established between Air France and the passengers and evidenced by the individual issuance of these tickets fits the description of the relationship required by the Warsaw Convention. First, Air France was in no way deprived of its freedom to contract, referred to by Article 33 of the Convention. Second, Air France, owner and operator, agreed to the carriage of each individual passenger. Third, Air France agreed to the route to be followed, evidenced by the tickets, thus accepting the route already agreed to by each passenger.

The only difference between this charter arrangement and the arrangements for an ordinary commercial flight is that in the present case payment for the transportation was indirectly routed through the Atlanta Art Association. However, since the Convention applies even to gratuitous transportation, there is no reason why a contract should not exist when the payment is indirect but comes from the passengers.

IV.

The plaintiffs assert that any ambiguity in the Convention itself is dispelled by the history of the treaty which allegedly proves that the framers intended to exclude charter flights. We find a good deal of disagreement and uncertainty whether certain charter arrangements come within the scope of the Convention. We do not, however, find any substantial evidence to the effect that *all* charter flights—whatever their nature and whatever the relationship betweeen the passenger and the carrier—were, as the plaintiffs contend, intentionally excluded from the scope of the convention.

A. The court below refused to consider the legislative history of the Convention on the ground that the language of the Convention was "unambiguous". We feel, however, that the determination in an American court of the meaning of an international convention drawn by continental jurists is hardly possible without considering the conception, parturition, and growth of the convention.

The American Law Institute Restatement of the Foreign Relations Law of

---

38. "Article 6. Carriage of Passengers, Baggage and Cargo. Charterer shall not permit any passenger to be carried unless such passenger has been issued a ticket by AIR FRANCE, nor permit any baggage to be carried unless AIR FRANCE has issued a baggage check therefor."

the United States gives the following blackletter rule for interpreting an international agreement:

"§ 149. Basic Function of Interpretation.

The extent to which an international agreement creates, confirms, modifies or terminates relationships under international law is determined in·case of doubt by the interpretation of the agreement. The primary object of interpretation is to ascertain the meaning in which the [high contracting] parties have used the terms in which the agreement is expressed, having regard to the context in which they occur and the circumstances in which the agreement was made. This meaning is determined in the light of all relevant factors."

Section 150 of the Restatement lists the following relevant factors, among others, to be taken into account, "by way of guidance in the interpretative process": the ordinary meaning of the words in the context in which the words are used, the title and statement of purpose, the negotiation of the agreement, drafts and records of deliberations, negotiating history, a party's unilateral statement of understanding, the subsequent practice of parties, change of circumstances relating to performance, compatibility with international law and general law. Similarly, the Harvard Research in International Treaties, 29 Am.J.Int.L.Supp. 937, 938 (1935), states:

"The historical background of the treaty, *travaux préparatoires*, the circumstances of the parties at the time the treaty was entered into, the change in these circumstances sought to be effected, the subsequent conduct of the parties in applying the provisions of the treaty, and the conditions prevailing at the time interpretation is being made, are to be considered in connection with the general purpose which the treaty is intended to serve. * * * All that can be said is that all of them are or may be significant in arriving at a sound interpretation in a particular case, and that none of them should be overlooked by the person charged with interpreting the treaty. Each of them may contribute in some measure to giving an accurate and complete 'picture' of the treaty in its setting, and it is only when so viewed that its general purpose can be fully comprehended and intelligently effectuated. Only then can one undertake to say what the treaty 'means'."

See also Hyde, International Law Chiefly as Interpreted and Applied by the United States 1481 (Rev. ed. 1945); Lauterpacht, The Development of International Law by the International Court 124–27 (1958).

"In its long experience as an interpreter of treaties the Supreme Court has maintained a record singularly free from the manifestation of a sense of obligation to exclude or ignore the probative value of evidence at variance with what the form of a text would appear to entail." Hyde 1481. The Supreme Court itself has said: "Of course treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." Choctaw Nation of Indians v. United States, 1943, 318 U.S. 423, 63 S.Ct. 672, 678, 87 L.Ed. 877. See also State of Arizona v. State of California, 1934, 292 U.S. 341, 54 S.Ct. 735, 78 L.Ed. 1298; Cook v. United States, 1933, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641; Nielsen v. Johnson, 1929, 279 U.S. 47, 49 S.Ct. 223, 73 L.Ed. 607. Speaking of the "plain meaning" canon, as applied even to a statute, the Court has said:

"When aid to construction of the meaning of words as used in the statute is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination'." United States v. American Trucking Ass'n, 1940, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345.

A multilateral treaty is rather like a "uniform law" within the United

States. The Court has an obligation to keep interpretation as uniform as possible. To fulfill that obligation and follow the consensus as to construction, the Court should resort to legislative history and to relevant extrinsic aids.

B. Changes in the draft conventions indicate that, although the Warsaw Convention was the first of its kind and did not purport to codify air law, *the terms of the Convention should be applied broadly.* Article 1(1) of the De Vos draft originally read as follows:

> "This Convention shall apply to international transportation of passengers, goods and baggage performed by aircraft for hire or by an air transportation enterprise with or without remuneration."

It remained unchanged until after the Conference rejected a Brazilian proposal that "carrier" be defined. See Section IV D of this opinion. The Conference then added the word "tout" (all) and a second sentence. As adopted Article 1(1) reads:

> "(1) This convention shall apply to *all* international transportation of persons, baggage, or goods performed by aircraft for hire. It shall apply equally to gratuitous transportation by aircraft performed by an air transportation enterprise."

Although the final draft restricted "international transportation" to transport between places in countries which were parties to the Convention, Citeja, commenting on Article 1(2), said:

> "The definition of *international* transportation has been made broad, so that a transportation whose place of departure and place of destination are situated in the same country, is still considered as international, if a stopping place is provided in another country, even a non-contracting one." (SJX6, p. 411)

The British delegation proposed that Article 1 of the draft be amended by adding a provision that "transportation between territories subject to the sovereignty or the authority of the same High Contracting Party shall not be deemed to be international for the purposes of this Convention". Such an amendment would mean that the Convention would not apply to flights within the British Empire. Sabanine, the Russian delegate, opposed the amendment:

> "By coming to this Conference, the Soviet Delegation had as its mission to defend, as far as possible, the application of the terms of the Convention *to all cases, without exception,* of international commercial air transportation."

The Conference defeated the British proposal, consistent with the general objective that the terms of the Treaty should apply broadly.

C. The plaintiffs point to the official title of the Convention—the "Convention for the Unification of *Certain* Rules Relating to International Transportation by Air". They contend that in general it reflects limited ambitions on the part of the drafters and the High Contracting Parties; that in particular the omission of any reference to charters showed an intention that the Convention should not apply to any charter or charter flight.

There is support for this view in post-Warsaw decisions of Citeja in the thirties to defer a convention on air charters as premature: (1) international charter flights were then still uncommon and (2) the legal problems created by the charters were so complex that a convention could not be drafted without first completing an exhaustive study of the subject. However, this view assumes that a convention would have to cover *all* types of air charters and the varying legal effects of the relationships of owner to charterer and of charterer to passenger. It ignores the position of a number of Citeja members and others who assumed the applicability of the Warsaw Convention to the contract of carriage resulting from voyage charter. It overlooks the common practices of airlines, as evidenced in charter forms and transportation documents. It underestimates both the vision of the men who drafted the convention and the tenacity with which

they held to their objective of creating uniformity in the area of the carrier's responsibility to its passengers and shippers.

The general attitude at the Conference which produced the Convention was not one of caution and fear of change. On the contrary, the participants accepted head-on the challenge to create a body of legislation that could keep pace with the rapid development of air transportation itself. De Vos, Reporter for the draft presented to the Convention, expressed this sentiment in his introductory speech:

"These are the essential traits of the draft of Convention submitted to you. As I said before, time has come to materialize. The air carriers expect of us that we give them and the underwriters the juridical base of their exploitation. Their transports are daily taking on unexpected proportions; in my country alone, at one single airport, in the summer season, there are up to 36 daily flights of regular airlines. The aircraft goes faster and faster every day so that the Fokkers, the Farmans shall soon appear to be tools of olden days. We still have in our ears the deafening sound of the supermarine which just won the Schneider cup, with a speed of about 600 kilometer (375 miles) an hour, and we have before our eyes the colossal spread of the Do-X which, on Lake Constance, has just demonstrated the possibility that tomorrow, in all countries, intrastructures shall be established for day and night flights. *What engineers are building for motors, we, jurists, must do for the code.*" [39]

Later in the proceedings the Polish delegation submitted a proposal that the drafters include a provision establishing a schedule for periodic revision of the Convention. This proposal was rejected. Amedee Giannini, head of the Italian delegation and president of the commission which prepared the draft presented to the

Warsaw Conference, spoke in his introductory remarks against this proposed provision, complaining that in effect it would be a declaration that the Convention was "merely a first attempt at codification, a first effort to codify air law * * *" and that if this provision were inserted in the Convention the drafters would be establishing "the principle that this first effort we are making today is not definitive." [40]

Werlich, one of the two American observers at the Warsaw Conference, said: "My understanding of the purpose of this Conference is to draw up a convention which, although it may not cover all the more important relations between passengers or shippers and the transporter in commercial air traffic will at least give the fundamental relations on which such commercial air traffic can be carried on." [41] In Garcia v. Pan American Airways, Inc., 1945, 269 App.Div. 287, 55 N.Y.S.2d 317, 320, aff'd, 295 N.Y. 852, 67 N.E.2d 257, cert. den. 329 U.S. 741, 67 S.Ct. 79, 91 L.Ed. 640, the court read Article 1 as stating: "The framers of the Warsaw Convention sought to effectuate the provisions of the compact, inclusive of the provisions specifically referred to, within as wide a scope as practicable in the light of the fact that its high contracting parties did not include all the powers of the world."

On the other hand, the Warsaw Convention was certainly not intended to cover all the problems arising in international transportation. As Secretary of State Cordell Hull wrote to President Franklin Roosevelt March 31, 1934:

"This Convention constitutes the first of a series of conventions on various subjects of private aerial law which have resulted or will result from the deliberations of the International Technical Committee of Aerial Legal Experts (Citeja), an international organization engaged in the preparation of a code of private air law through

39. II Conférence Internationale 17.

40. Id. at 23. See also Flandin, France. id. at 28.

41. Werlich, Report to the State Department, Archives 579.6L2/34–35, pp. 1–5.

**340**

the adoption of draft conventions on which final action is taken at general international conferences called for the purpose of considering the drafts." [42]

Ide, the other official American observer cites as an example of one subject not covered at Warsaw, the liability of air carriers for damage caused to third parties on the ground. Damage to third parties was originally to be discussed at the Warsaw Conference but because of a failure to reach an agreement on certain points the subject was set aside. Ide, The History and Accomplishments of the International Technical Committee of Aerial Legal Experts [Citeja], 3 J. Air L. & Com. 27, 38–39 (1932). The subject was brought up, however, at the next International Conference, and damage to third parties became the subject matter of the Rome Convention of 1933. Other examples of subjects Citeja studied in 1929 which were not discussed at Warsaw, were the establishment of an aeronautical registration system for registering the ownership of all airplanes; mortgages and aerial liens; the legal status of the commanding officer of an aircraft; and the problem of rescue at sea. Ide, supra at 40. Clearly, therefore, certain subjects were purposely not covered by the Convention, as is evident from the limitation expressed in the Convention's official title. The Conven-

tion was concerned primarily with the uniform rules for dealing with transportation documents and the liability of the air *carrier* to its passengers for injury or loss.

D. Only once during the Warsaw Conference were charters mentioned. That was in a proposal by the Brazilian delegation to define the word "carrier" in the following terms:

"The carrier shall be considered the person who owns, charters or manages an aircraft, uses it individually or jointly in the transportation of persons and goods, within the meaning of this convention, and in conformity with national regulation." [43]

This proposal would have brought all air charters within the scope of the Convention and made the charterer jointly liable with the owner. Giannini expressed the sentiment of the Conference: the matter was beyond the realm of the Convention. He stated:

As far as this Brazilian proposal is concerned, the Commission felt that this problem was outside the realm of the convention. Since, in this Article, we have made statements and definitions for practical reasons, that is to say that the codification of private air law is made progressively, we have to anticipate a bit, we have examined cer-

---

42. 1934 U.S.Av.Rep. 240, 241.

43. The Brazilian delegation's statement in support of this proposal reads as follows: "Since the status of the air transportation operator differs, due to the inherently international character of aircraft, from rules relating to the captain in merchant marine, and the boatman in river navigation, or to the carrier in overland communication, it would be useful for this designation to assimilate the multiple concept as to his responsibility.

This is all the more necessary, as the word carrier, so adequate to the end of its destination, nonetheless does not correspond exactly to most designations used in the laws of different countries. It is used neither by the French texts of most international conventions, nor in the draft concerning liability for damages caused to third parties, presented in May by Mr. Ambrosini, who merely refers to the owner and operator of the aircraft.

If it is wished that the carrier be the air transportation entrepreneur or its exploiter, in the meaning of economic control of the craft and established by German, Swiss, Hungarian, Dutch jurisprudence, etc., or that he should be the one for whose account the aircraft is exploited, according to Danish law; and if it is wished to conform to the convention the concept of solidarity provided by the Polish Law, art. 71, between the owner.

If it is wished to bring closer to the general formula the English concept of hire, in air transportation, characterized by the period of contract, which concept exists in the laws of many states of North America * * * this goal could be achieved by qualifying the carrier on an equality with the transport." II Conférence Internationale 97; SJX4, p. 2; JX6, p. 235.

tain problems which touch upon other conventions. But since in this case there was no necessity to define the carrier, we thanked our colleague from Brazil, who furnished a great effort, and we have referred his proposal to the C.I.T.E.J.A. for its consideration. Thus no decision has to be taken.[44]

The plaintiffs contend that the rejection of this proposal serves as a rejection of any connection between the Convention and charter flights. We do not agree with this interpretation. What the Brazilian proposal recognizes is that in some circumstances a problem will exist as to *who is the carrier for Warsaw purposes*. The explanatory note accompanying the proposal points out that according to the law of several countries certain charter arrangements would create a joint liability between the airlines and the charterer *or* would even thrust the whole liability upon the shoulders of the charterer itself. In presenting the proposal the Brazilian delegation hoped to clarify once and for all who would be liable in such situations.

The Conference did not give its reason for rejecting the proposal. Resolutions included in the Final Protocol noted that the Warsaw Convention regulated only "certain" questions relative to transportation, took cognizance of the Brazilian proposal "with respect to the definition of the carrier", adhered to the view that the question should not be settled in the Warsaw Convention, and referred the matter to Citeja for study.[45] The delegates may have decided (so De Vos thought) that it was better to leave the definition of "carrier" for the courts to work out in accordance with the general law of the forum.

[11] It seems clear enough from the discussion at Warsaw and, later, in Citeja meetings that the type of flight here the subject of this litigation would have raised no doubts in the minds of the Brazilian delegates. Here the Art Association could not qualify as the carrier. Air France was in total control of the flight. Air France was the only party in a position to comply with the formal and documentary requirements of the Convention. And Air France had assumed all the obligations of a contract of carriage that it would have assumed if the flight had been of an ordinary commercial nature. The Atlanta Art Association had no contractually based responsibility towards the passengers for performance of the obligation to transport or for the safe conduct of the flight. By the terms of the charter, the Association was the agent of the passengers. Reduction of the charterer's role correspondingly increases the owner-operator's role vis-à-vis the passenger, leading to the conclusion that in this country, when the charterer is only an agent, that the contract of carriage must be between the owner-operator and the passengers. The Atlanta Art Association could not have been the carrier. See footnotes 36 and 57.

E. Mention of charter flights is made in the groundwork leading up to the 1929 Warsaw Conference, but here, too, the reference is to special problems that may arise in ambiguous charter situations, such as "who is the carrier" and what is the charterer's liability. At the First International Conference on Private Air Law held in Paris in 1925 a preliminary draft was presented to the delegates specifying nine topics to be considered. As noted earlier, one of these topics was "location d'aéronef" or "hiring of airplanes".[46] Citeja was created to make a detailed study of the draft and other problems that might arise. Citeja in turn established four commissions (subcommittees) and divided the workload among them. Among the five topics assigned to the Second Commission was "location des aéronefs."[47] May 1929, three years later and only five months before the Warsaw Conference convened,

44. Ibid.

45. Ibid.

46. Archives 579.6L1/24.

47. Minutes and Reports of the first session of Citeja, Archives 579.6L1A/22½ at p. 26.

the question of "location des aéronefs" was raised for a brief discussion, ending in a decision, urged by De Vos and others, to put it aside for a later date.[48]

The plaintiffs contend that by tabling the question the members of the Second Commission and, later Citeja itself, expressed the intention to kept charter flights outside the regime of the Convention. Minutes of the Second Commission meetings prior to the 1929 Warsaw Conference are not informative; minutes of the later meetings in which the delegates addressed themselves in more detail to the issue of "location des aéronefs" are more useful.

These post-Warsaw meetings show a concern, similar to that expressed by the Brazilian delegation, as to whether charterers, not charter *flights,* are covered by the Convention. As Drion pointed out in his book, Limitations of Liability in International Air Law 133 (The Hague 1954):

"The *Warsaw Convention* does not contain any definition of who is to be considered a 'carrier'. An attempt by the Brazilian Delegate at the Warsaw Conference to insert a definition, mainly to take care of the problems arising under charter agreements, failed to receive support, so that one must now distil the meaning of the word from the wording and system of the Convention itself. * * * The main choice is between the following possibilities:

(a) carrier is he who has concluded in his own name a contract for the carriage of passengers or goods [or]

(b) carrier is he who actually performs the carriage governed by the Convention."

In these meetings and subsequently, De Vos, the primary author of the Convention, consistently took the position that in air charter relationships there are two distinct contracts: "the contract which exists between the passenger and the carrier [which is regulated by the Convention] and another contract, which is the contract between the owner of the aircraft and the operator [or the charterer]. What is the situation in the second case? It should be examined in a separate convention." [49]

In 1932 Major K. M. Beaumont, representative of the International Air Traffic Association (IATA) [50] at the Warsaw Conference, attempted to review with certain delegates to the Conference the question whether the Convention was intended to cover air charters. He reported to IATA that the replies he received "seemed to indicate that the Government draftsmen responsible for the Warsaw Convention did not contemplate charter contracts coming within the provisions of the Convention at all, though they were unable to quote from the Convention itself any provisions which would have the effect of taking such hirings out of the obligations imposed on carriers by the convention. * * * " The IATA then directed a questionaire to Citeja regarding the effects of the Convention on several types of charter and suggesting that Citeja consider whether it would be desirable to prepare an international convention on contracts of charter and lease of aircraft. The IATA asked whether, assuming that the Convention applied to some charter flights, the owner or the charterer was responsible for the application of the provisions of the Convention, including particularly those con-

48. Archives 579.6L1A/84.

49. Archives 579.6L1A/382.

50. IATA is an international association of airlines. As the plaintiffs point out, the association had, of course, an axe to grind. But see letter from Secretary of State Cordell Hull to President Franklin Roosevelt, dated March 31, 1934: "This Convention has been studied by the Department of Commerce, which advises adherence thereto by the Government of the United States. That Department has expressed the view that the provisions of the Convention are fair and afford protection to the air-transport operator as well as to passengers and shippers, and that if the United States fails to become a party to the Convention, American air-transport lines operating on an international basis will be at a disadvantage while operating in countries that are parties to the Convention." 1934 U.S.Av.Rep. 240, 244.

cerning transportation documents. The Secretary General of Citeja referred the questionnaire to De Vos, as Reporter for the Second Commission. Because of De Vos's having been the Reporter of the Convention, he questioned the propriety of his answering authoritatively in the name of Citeja questions from a private association. And he questioned the value of his individual opinion or even that of Citeja's in the interpretation of an international Convention. Nevertheless he added, "Having said this, I can give you my opinion on the matter". His letter succinctly states the case for construing the Warsaw Convention as applicable to the carrier (airline)-passenger relationship in a voyage charter flight, regardless of the inapplicability of the Convention to the relationships and liabilities of the owners, charterers, lessees, and others. In pertinent part, De Vos wrote:

> "The problems raised by the I.A.T.A.'s note are interesting, merit an examination and might form the subject of a special convention.
>
> But they do not challenge the provisions of the Warsaw Convention itself. The latter governs the relations between the party who assumes the liability for the transportation [the carrier] and the one who is transported [the passenger] or has something transported [the shipper].
>
> *Whether the party who accepts the transportation is the owner or simply the charterer—for a period of time or by the trip— the situation of the passenger (transporté) or the shipper will not be changed: their rights and their obligations continue to be determined by the articles of the Warsaw Convention.*

The acts, the engagements of the owners and the charterers among themselves, are acts or engagements which do not bind the traveler or the shipper res inter alios acta.

Conclusion: Side by side with the rules established by the Warsaw Convention on the carrier's liability, there exists a matter connected with the contract of transportation concerning the relations between owners, charterers, lessees, et cetera, which can and should, to my mind, constitute the subject of a thorough examination on the part of the C.I.T.E.J.A." (Emphasis added.) [51]

Major Beaumont and, of course, the airlines were especially interested in determining responsibility for the issuance of tickets and other transportation documents, wholly aside from the question of the respective liabilities of owner and charterer. In a report to the IATA in August 1933 Beaumont wrote:

> "The main difficulty is not to decide who has to be considered the 'carrier' for purposes of the Warsaw Convention in connection with charters. Usually the party who normally operates the aircraft will be the 'carrier'. The difficulty in such cases is a practical one—namely that of complying with the somewhat complicated regulations concerning Tickets, Baggage Checks and Consignment Notes when the aircraft is operated away from aerodromes where the operator has representatives who can attend to these formalities."

But on the question before this Court he saw eye to eye with De Vos:

> "The 'international carriage' referred to in the Convention is carriage of passengers, baggage and goods for reward, and gratuitous carriage by an

51. Defendant's Exhibit T-1, p. 2, Citeja Doc. 182; Archives 579.6L1A 339, 344. De Vos' answer to the 1932 IATA questionnaire was duly forwarded by the U.S. Embassy in Paris to the Secretary of State in Washington on December 8, 1932 (State Department file 579.6L-1A/339; see Defendant's Exhibit 'T-2', pp. 1, 11, 12–17). It was translated by the State Department and an English translation of the De Vos answer was forwarded to the Secretary of Commerce on January 9, 1933 (State Department file 579.6L1A/344; Defendant's Exhibit 'T-2', pp. 20, 33–36)."

**344**

air transport undertaking. It appears to be clear that some contracts of charter and hiring must come within the meaning of this description." 1932 Report to IATA, Defendant's Exhibit U–1, p. 1.

Thirty years later, Major Beaumont adhered to this opinion.[52] See also Shawcross & Beaumont, Air Law §§ 351(2), 359 (1951).

February 14, 1933, the IATA questionnaire and the De Vos letter came up for consideration at a meeting of Citja's Second Commission. De Vos reaffirmed his views that the IATA seemed to confuse two different contracts, the one between the carrier and the passenger and the other between the owner and the operator (charterer); the second should be examined, if at all, in a separate convention. Professor Giannini of Italy argued that the "question consisted in seeing whether charter-parties should be introduced in air law * * * and what should be the relationship between the owner and the operator".[53] The Commission voted to refer the question to Citeja with the request that it be put on the Commission's agenda.

October 2, 1933, the Second Commission met and voted again to request Citeja to charge it with a study of the charter-hire question. De Vos declined to serve as Reporter for the project, "because of the preconceived ideas which he had expressed". The Commission selected first Hess and, later, Professor Pietro Cogliolo, to serve as Reporter. De Vos

again expressed the view: "There are no grounds for an international convention. The regime of liability was not going to be altered according to whether it was the owner, the charterer or the operator who was in question: the regime was always the same. * * * Should Citeja be informed that this question did not seem to be material for an International Convention *although we would not refuse to study it?"* [54] (Emphasis added.) October 4, 1933, Citeja itself met and approved the decision of the Second Commission to retain the charter-hire question for study.

The minutes of the Second Commission meeting of February 26, 1936, show the breadth of the subject matter included under the heading "location des aéronefs". Cogliolo, the reporter for the topic, described to the meeting the questions he intended to cover, most of which dealt with the allocations of liability between the charterer and the airlines, and none of which justify a failure to apply the Warsaw Convention to the present case. The questions Cogliolo presented were as follows: (1) What are the obligations of the owner to the charterer; (2) Can the charterer assign the contract of charter; (3) Should there be special rules governing the leasing of aircraft; (4) Against whom do third parties have rights; (5) What is the effect of force majeure; (6) Who bears what expenses to keep the plane airworthy; (7) If insurance is obligatory, who should take it out; and (8) Whether charter contracts should be required to be entered in the aeronautical

52. In 1963, by affidavit filed in the record, Major Beaumont expressed the opinion: "In a situation in which 'A' charters an aircraft from 'C' for the carriage of 'B' on a specific flight from the country of one High Contracting Party to the Warsaw Convention to the country of another High Contracting Party, with return to the country of the first High Contracting Party; where 'C', the air carrier, owns, operates and controls the aircraft and, prior to departure, delivers tickets (meeting the requirements of Article 3 of the Convention) to 'B' for that passage, the Warsaw Conven-

tion would be applicable (unless the flight was expressly excluded by Article 2 of Article 34 of the Convention), and 'B', the passenger or passengers, would be entitled to the presumption of liability contained in the Warsaw Convention as against 'C', and 'C', the air carrier, would be entitled to the limitation of liability also contained in the Convention as against 'B'." (Defendant's Exhibit "Q".)

53. Archives 579.6L1A/382; Citeja Doc. 197.

54. Archives 579.6L1A/444; Citeja Doc. 205.

register.[55] The plaintiffs emphasize certain selected statements of Cogliolo:

"Therefore, the first problem to be settled is this: is there a right of action against the owner or not? The nature of the relationship which exists must be defined.

Once one has established the nature of this relationship, a second question arises—that of the limitation of liability stipulated by the Warsaw Convention. Since the Warsaw Convention does not mention this case, does the limitation of liability apply when an aircraft is leased in accordance with the first hypothesis or the second hypothesis? * * *

Do third parties have rights against the owner or only against the charterer? And again, in this case, is it necessary to state what rights the third parties have depending upon which one of the parties' hypotheses which we have contemplated is adopted."

The defendant observes that Cogliolo, like any good Reporter, explained that "in my report of February 1936 was a list of a considerable number of possible questions, which I presented solely for the purpose of bringing them to the attention of experts". It seems to the Court that, for purposes of this litigation, the Reporter's most important statement was:

If the owner of the aircraft and the operator of the air carriage have hired out a given space in the aircraft to a third party, where the latter may place his goods, *but the carriage is nevertheless entirely controlled by the operator, this may constitute a form of air carriage and the Warsaw Convention therefore applies.* (Emphasis added.) [56]

55. Archives 579.6L1A/1066; Citeja Doc. 297; SJX7–8.

56. Archives 579.6L1A/1302; Citeja Doc. 328, May 1937; SJX12. Cogliolo reported: "After the meeting of February 1936 I received valuable observations from several Experts.

Our colleague, Mr. Babinski (Poland), observed that from the international viewpoint, the important question was that of liability and that the rules of the contract for the hire of aircraft depended upon contracts concluded between the owner and the operator. In a possible revision of the Warsaw Convention the hire might be regulated and at any rate the contract of hire should appear on the aeronautic register.

Our colleague, Mr. Schonfeld (Netherlands), expressed the following opinion: separate regulations for the hire of aircraft are not necessary. According to the Rome Convention, the operator is liable for the damages to third parties and the 'frêteur' [charterer] is the operator. With respect to transportation, the Warsaw Convention may be amended, but it cannot be said to govern the contract of hire. The Hungarian Expert is of the same opinion and says that in Hungary, airplane hiring is not practiced. * * * There still remains the question of liability, and it is on that question that the CITEJA may formulate a few directive concepts which may serve for a possible subsequent regulation. The directive concepts upon which our discussion may be

carrier on would be the following: 1. In the relations between the hiring owner and the charterer (conduttore) * * * the national rules, civil and commercial, of the nation which is competent to pass on the contract are applied as far as possible. 2. International regulation of the liability may be made in two ways: either by a short international convention having a separate existence, or through an addition to the Warsaw Convention and with a broad interpretation of Article 4 of the Rome Convention. 3. In case the owner has leased the aircraft fully equipped, that is, with its own crew and with its own pilot, the owner is liable to the charterer, unless the damages occurred through the act or the orders of the charterer. With respect to damages to third parties there is joint liability shared by the owner and the charterer. 4. If the owner has furnished the aircraft only, without crew or pilot, he is responsible only for damages arising through defects in the craft. 5. In the foregoing cases the Warsaw Convention cannot be applied, unless recourse is had to additions or amendments thereof in accordance with Article 41 of the said Convention. 6. If the owner and the operator of the aircraft have rented to a third party a certain space in the aircraft for him to deposit his merchandise, and if the transportation is entirely governed by the operator, there may be in such a case a form of air transportation and an application of the Warsaw Con-

This statement referring to a "given space" (that is, less than the whole aircraft) was appropriate because the reference was to a shipment of goods. A passenger, of course, would be in the same position as a shipper.

In July 1937 the Second Commission met again to consider Cogliolo's second report. De Vos again expressed his belief that the Warsaw Convention governed the carrier-passenger relationship, and that the primary problem worthy of study was the relationship between the owner and the charterer. Cogliolo and others favored a broad, exhaustive study. The dominant feeling was that the subject was complex and at that time it was premature to regulate it by international convention.

Cogliolo's report was never definitively considered by the Second Commission, owing to World War II and the events which led up to the war. After the war, Citeja removed all references to hire and charter from the general draft revision of the Warsaw Convention on which the Second Commission was working. Citeja assigned the study to the Third Commission. Dr. Jean Maniatopoulos of Greece, the Reporter, drafted a proposed convention bringing the hire and charter of aircraft within the Warsaw Convention. In his 1946 report he referred to "the possibiliy of applying the Warsaw Convention to contracts of hire or charter of aircraft". He stated:

"Charter must be considered in its two customary forms:

A) charter for a given journey and

B) charter for a given period (Art. 7)"

"In principle, both forms are dealt with in the same manner. *However, in the case of charter for a given journey, where the charterer will be using the aircraft exclusively for his own purposes, the Warsaw Convention has been considered as applying.* This Convention has therefore been considered as applying generally, provided that all the requirements for its application are fulfilled." (Emphasis added.) CITEJA Doc. No. 423, Plaintiffs' exhibit SJX9, p. 3.

In 1947 Citeja was liquidated and replaced by the Legal Committee of the International Civil Aviation Organization (ICAO). The ICAO appointed a Sub-committee, of which Major Beaumont was a member, to consider the need for an international convention on the charter and hire of aircraft. The Sub-committee's report, presented at the International Conference at The Hague in 1955, contains the following statement:

"3. During the study of the problems which may arise in connection with hire and charter of aircraft, the Sub-committee considered that a special one arises under the Warsaw Convention. The Convention does not touch upon

---

vention. 7. Contracts of hire, except those of simple transportation contemplated in No. 6, should be recorded on the aeronautical register.

A discussion by the Second Commission will be opportune on these points: indeed if not only myself but all our Expert colleagues have said that the rarity of the cases of renting aircraft renders international regulation of no urgency, that does not prevent it being a matter of great utility on the part of the CITEJA to discuss and determine a few fundamental and directive ideas."

The defendant contends that the first five statements relate to European charters where the charterer is not the passenger but may issue tickets to third

parties in his own name, i.e. the charterer contracts with the passengers to transport them. CAB regulations forbid this practice. In effect, therefore, the Atlanta Art Association could act only as an agent. Indeed, the district court so held. 229 F.Supp. at 80. See fn. 36. The plaintiffs assert that the defendant is arguing, in its first reply brief, that the charter has faded out and that the charterer has become each passenger. Article 8(f) of the Charter Flight Agreement delineates the status of the Charterer: "This Agreement is entered into by the Charterer *both on his own behalf and as duly authorized agents* for all passengers."

the question of the liability of the aircraft owner where damage is caused during international carriage *and the carrier is not the owner of the aircraft.*" (Emphasis added.) (SJX14, ICAO Doc. 7686/140, vol. 11, p. 115.

The inference one must draw is that the Sub-committee concluded that the Warsaw Convention applies when the carrier *is* the owner of the aircraft. The Note of the ICAO Secretariat, June 21, 1955, prepared for the Sub-committee had stated that in assessing the need for an international convention and in determining the problems to be solved, the Sub-committee would have to consider, among other problems, (1) the relationship *inter se* of the aircraft owner and the charterer and (2) the relationship of the owner to passengers. However, one of the conclusions of the Sub-committee's report was:

"17. The relationship of the carrier to passengers, shippers, consignees and owners of baggage is, in the case of international carriage by air, affected by the Warsaw Convention which lays down liability rules in respect to such carriage."

The Sub-committee considered that its terms of reference called for an examination of all aspects of chartering, a task too complex to be attempted in the short time available before the Hague Conference. Instead it directed its attention to the single point whether a clause concerning charters should be inserted in the Protocol to amend the Warsaw Convention. The Final Act of the Conference states that the matter was too complex to permit the insertion of such a clause in the Protocol, but the subject should be further studied by the ICAO.

Mr. G. Nathan Calkins, Jr., Chief of the International Rules Division of the Civil Aeronautics Board, and head of the American delegation to the Conference, agreed with the position taken by the Conference. He too called attention to the fact that the Convention regulated the relationship between the parties in the contract of carriage.

"Mr. Calkins (United States) said that there was no necessity for inserting additional provisions in the Convention for dealing with the various types of charter arrangements. The Warsaw Convention had been designed to deal with the *relationships between the parties to the contract of carriage* and, the Convention should not be extended beyond this. * * * As to cases falling within the generally accepted definition of a charter, he believed that the Convention now adequately regulated the relationships between the parties to contracts of carriage and if there were charter contracts which did not fall within the definition of a contract of carriage, they should be left outside the Convention." (Emphasis added.) SJX14, ICAO Doc. 7686/LC/140, vol. 1, p. 234.

The minutes of the next meeting of the ICAO Legal Committee, in Tokyo in 1957, seem like an abridged re-run of all the discussion of air charters that has occurred since the Warsaw Convention in 1929. SJX14, ICAO Doc. 7921–LC/143–1. The Sub-committee on Hire, Charter, and Interchange of Aircraft in its report to the Committee showed concern over the problem of air charters in general. But this concern does not, as the plaintiffs contend, show that all charter flights are beyond the scope of the Convention. As Garnault of France said, "The necessity for the new Convention was determined by a lack of precision in the Warsaw Convention, and because of a need for finding out who was, actually, the person protected by the Convention". The Sub-committee stated, the difficult problems arise "when an aircraft, or any part of the space in an aircraft is chartered or hired with a crew". The question is not, Does the Convention apply. The question is, as the Committee reported, What are *"the respective liabilities of the owner and charterer or hirer under the Convention in respect of passengers"?* And the next question is *"whether in those provisions of the Convention which refer to 'the carrier', the owner or the charterer or hirer is the per-*

*son meant*". The Chairman of the Legal Committee took the same approach as the Brazilian Delegation thirty years before:

> "Rather than adopt a new convention * * * would it not be possible to achieve the same result by making an authentic interpretation of the word carrier *within the* meaning of the Warsaw Convention."

The discussion prompted Otto Riese, a German veteran of Warsaw and Citeja, to say that he did not believe that the Committee could draw a satisfactory definition of such a complex concept as charter. Richardson of Australia referred to the "basically different legal concepts in various countries". He thought, "To interpret this international convention on private air law was a matter for the courts and not for the Committee". The Committee took no action except to agree to continue its study of charters generally.

There the matter stood in 1957. There it stood in 1929. So it stands now.

We conclude that the history of the Convention, before and after Warsaw, shows that the Warsaw Convention applies to a voyage charter flight. The question courts must decide, within the context of each case, is: Who is the carrier?

### V.

Commentators on air charters, generally speaking, recognize that the Warsaw Convention applies to certain charter flights.

Professor Ambrosini, a member of Citeja and one of the leading Italian delegates to the Warsaw Conference, was the author of a draft convention on the liability of an "owner" and "operator" of aircraft for damage to third persons. He carefully avoided using the term "carrier" ("transporteur"). It was this draft that led the Brazilian delegation to propose that "carrier" be defined. Ambrosini points out that standard voyage charter agreements have usually been given the character of contracts of carriage and, as such, are covered by the Convention.[57] He has commented:

> "The question, [the applicability of Warsaw to charters] to our way of thinking, was poorly stated since the problem is not whether the Convention is applicable to 'charter' proper and especially to 'time charter'. In such a case the answer is certain: the Convention *does not* apply. [Italics added.]

> On the contrary what can be said is that if a contract called by the parties 'charter' is not in essence more than simple transportation then *it does* fall under the rules of the Warsaw Convention; just as transportation in which the charterer has contracted with a third-party and executes with the aircraft that he has chartered falls within that Convention but this is another matter."

Otto Riese, a German delegate to Warsaw, has written: "Our previously expressed opinion (Archf LR 1939 S.137-ZAIP 1933 S.979) that the Convention does not apply to charter contracts and that it is easy to decide if a transportation contract exists, we can no longer uphold. We agree now with Goedhuis that there exists a loophole here." Riese, Luftrecht § 42(3), at 408 (Stuttgart 1949).

In 1954, Huibert Drion, Professor at the University of Leiden, Netherlands, wrote: "A voyage charter, however, by which one person assumes the obligation to carry with his aircraft and crew, from one point to another, certain persons or goods agreed upon or to be indicated by the charterer, would be a contract of carriage governed by the Convention. * * *" Limitations of Liabilities in International Air Law § 53, at 57 (1954). In 1963, by affidavit filed in this case, Drion confirmed his earlier conclusion: "The fact that the carriage is performed pursuant to a charter contract between airline and an association does not set the transportation outside the sphere of

---

57. Ambrosini, Fletamento y. Transporte- Com relacion al llamado "charter aereo," 1952 Revista Brasileira de Direito Aeronautico, p. 5.

application of the Convention, nor does it deprive the airline from its quality of 'carrier' within the meaning of the Convention, the liability of whom is governed by the provisions of the Convention. The Convention does not contain any provision excepting transportation performed under a charter agreement." Defendant's Exhibit "R".

Professor Daniel Goedhuis concluded that the owner of an airplane should be considered the carrier with respect to the charterer, because he finds himself to perform the transportation for the account of the charterer; the charterer would be the carrier with respect to the passengers. The Warsaw Convention would then apply to the charterer-passenger relationship, but not to the owner-charterer relationship. Goedhuis, Les Contrats de charte et de louage des aéronefs en connexion avec la Convention de Varsovie, 59 RDILC 687–702; National Air Legislation and the Warsaw Convention 131–36 (The Hague 1937). Goedhuis, however, had reference to the situation where the charterer subcontracts the aircraft or where the charterer issues tickets and other necessary traffic documents.[58] There is no inconsistency, therefore, between the position as stated in his writings and his affidavit which is filed in this case. In the affidavit Goedhuis emphasized the control of the plane by the owner-operator (Air France) and the issuance of tickets by the owner-operator,[59] which evidence the direct relationship between carrier and passenger contemplated in the Convention and required in connection with the issuance of Warsaw documents.

Coquoz, author of De Droit Privé International Aerien (Paris 1938), distinguished between the leasing of an aircraft (a bare hull charter), which would not be governed by Warsaw, and "a manned aircraft" for "a given voyage" (voyage charter) or for "a given period of time" (time charter). "If the chartered aircraft serves for the transportation of the person [essentially the Air France-Atlanta charter flight] or of the goods of the charterer himself, we are confronted with an air transportation to which the Warsaw Convention undoubtedly ap-

58. See discussion of Goedhuis in Grönfors, Air Charter and the Warsaw Convention 40–45 (The Hague 1956). The carrier ("transporteur") must be able to issue the necessary transportation documents. "The Warsaw Rules, Goedhuis states, apply to a wider extent to *voyage charter agreements* (where the owner puts at the disposal of the charterer an airplane equipped to make a specified journey which is international within the meaning of the Convention). *If the charterer is a private individual* who himself wishes to make the journey or who wishes to carry his own merchandise, the owner should be regarded as a carrier within the meaning of the Warsaw Convention, 'because the carriage is international and for reward, and because the charterer can be considered as a passenger' (or consignor). This carriage therefore comes under the Convention. *If the charterer concludes contracts of carriage with passengers or consignors,* the charterer in this situation will also be deemed to be a carrier within the meaning of the Convention, which thus applies. The owner, however, cannot in his relation to the charterer be looked upon as a carrier, as he is unable to satisfy the obligations of a carrier to issue the required transportation documents (no direct relation between him and the passengers or consignors).

The general idea behind the three leading principles of Goedhuis seems to be that *the Warsaw Rules cannot apply if, because of their contruction, they* do not fit properly into the charter situation in question (i. e.., the situation does not lend itself to the Rules)." Grönfors, p. 44.

59. "His opinion has been asked on the question whether, in a situation in which 'A' charters an aircraft from 'C' [Air France] for the carriage of 'B' on a specific flight from the country of one High Contracting Party to the Warsaw Convention to the country of another High Contracting Party to this Convention, with return to the country of the first High Contracting Party, where 'C' [Air France], owns, operates and controls the aircraft and prior to departure delivers a ticket to 'B' for that passage, the Warsaw Convention would be applicable.

He states that provided the ticket delivered by 'C' meets the requirements of

plies." [60] At this point Coquoz discussed the question of the charterer subcontracting the aircraft, selling tickets for a profit to third parties, which is permitted in Europe but not in the United States. It was on this question that he disagreed with Goedhuis.[61] Sundberg points out too that Goedhuis is a typical proponent for the general continental school that finds contract as the basis for the Warsaw Convention's system, while Coquoz prefers to find the basis in the actual flights to be performed. Sundberg 299. Sundberg also notes that the majority view that the issuance of traffic documents requires a direct contract between the Warsaw carrier and the passenger/shipper; without this direct relation, there cannot be a Warsaw carrier and a contract of carriage in the sense of the Warsaw Convention. But, Sundberg observes:

> Art. 3 of the Convention, this question should be answered in the affirmative.
> Both the history and the text of the Convention prove that when 'C' [Air France] is performing a carriage which constitutes international carriage as defined in art. 1(2) of the Convention and is satisfying the obligations imposed by the Convention, he has to be considered as carrier within the meaning of this convention." (Defendant's Exhibit "S".)

60. Coquoz, supra, note 17, at 93.

61. "This view [of Goedhuis] seems perfectly sustainable. It logically envisions the carriage in terms of a contractual obligation. The charterer who has engaged himself with regard to the passenger or the shipper is the only one held liable.
 Nevertheless, we do not share this view [of Goedhuis]. The text of the Warsaw Convention seems contrary to such a restricting interpretation. According to its text (art. 1 and articles 17 to 20), the carrier is not necessarily the person that has participated in the contract, but rather the person that executes the carriage.
 The solution—it is true—does not result in an obvious way. On the other hand, the acts of the CITEJA and of the conference reveal to us clearly enough, that the authors of the Convention did not intend to regulate chartering. This does not stop the Convention from being applicable, if the text permits it (25). Moreover, the legal tie that binds the owner

"To Coquoz and others of his persuasion this argument is no real objection. His own bases in this regard are most helpful. The direct relation exists naturally between the airline operating the aircraft and the passengers inside it and the shippers of the cargo put in it. To Coquoz, ticketing and waybilling are reduced to purely formal acts in the setting of the Convention; but to the general Continental school they are fundamental acts, prima facie evidence of the contract which puts the whole of the Conventional system into effect." Sundberg 305.

For K. Grönfors, as for other commentators, there is no doubt that charter flights come within Warsaw; the problem is how to determine who is the carrier. When the functions of a Warsaw carrier are divided, the party exercising the most important functions has the status of carrier.[62] "If the aircraft own-

> and the charterer includes among other elements, a real carriage contract for the execution of which the owner exercises his usual activity of forwarding agent. It does not matter that the obligation of carriage concerns the charterer himself or the passengers and the shippers. It does not matter if the charterer is directly interested in the carriage or is acting as a commercial intermediary. In fact, an international carriage is executed by the owner: he is liable with regard to persons or goods transported, to fulfill all the obligations imposed upon him by the Warsaw Convention and his liability is under international law (26). The definition formulated by the delegation of Brazil at the Warsaw Conference, and mentioned above, confirms our point of view. It insists upon the action of carriage without taking into account the contract. On the other hand, the Convention does not determine the reciprocal relation of the owner and charterer in case of subchartering: it will therefore be necessary, in this respect, to consult common law, such as maritime law.
> This legal situation is confusing and complex. It would be timely to introduce into the Warsaw Convention a provision which would eliminate all uncertainty." Coquoz, supra, note 17, at 93.

62. See discussion of Grönfors in Sundberg, Air Charter 306-7. "The complete Warsaw carrier, arrived at in this way is, of course, a rather utopian figure in

er would in any case really have no practical possibility of issuing transportation documents, the Convention can no longer apply." Grönfors, Air Charter and the Warsaw Convention 91 (Stockholm 1956).

In short, almost all writers on the subject of the Warsaw Convention recognize that there are Warsaw charters and non-Warsaw charters. Most of the writers acknowledge that a three-party charter is a Warsaw charter; with them as with Citeja, the problem is, who is the carrier under the terms of the Convention.

### V.

No reported decision is precisely in point. We agree with the district court's conclusion, however, that although "the question seems to be novel, other courts, where the issue could have been presented, have indicated that, in a similar factual situation, Warsaw would apply." 229 F.Supp. at 806.

The district court relied on Flying Tiger Line, Inc. v. United States, Ct.Cl. 1959, 170 F.Supp. 422, and Mertens v. Flying Tiger Line, Inc., S.D.N.Y. 1963, 35 F.R.D. 196. Both cases deal with charter flights but in neither case did the plaintiff contend that charter flights were excluded from the scope of the Warsaw Convention. The courts did not examine the language or the history of the Convention to determine if the Convention governed charter arrangements.

In Flying Tiger Line v. United States, the question was whether the two-year limitation contained in the Warsaw Convention barred recovery. The Court said: "There is no serious question as to the applicability, in general, of the Warsaw Convention to the transportation involved in this case."

In Mertens, the Court, in effect, held that the owner who was also the operator was the carrier. The United States chartered a plane from the airline to transport military personnel to Tokyo. One of the questions on a motion for a new trial was whether a charter flight came within a United States reservation to the Treaty excluding "transportation by air performed by the United States".[63] The district court dismissed the motion holding that "The fatal flight * * * was an international flight pursuant to the terms of the Warsaw Convention". But by prior agreement, as the Court observed, the parties had stipulated that the Warsaw Convention was applicable.

When Mertens reached the Second Circuit, 341 F.2d 851, the court noted that there were "doubts as to the applicability of the Convention" because of the reservation. It was "urged that because defendant's plane was regularly and in this instance chartered by the United States for the transportation of military cargo and personnel to military destinations this international transportation was 'performed by the United States', thereby making the Convention inapplicable". The Court held: "We are of the opinion, however, that the transportation was performed by the Flying Tiger Line, the owner and operator of the aircraft, and that it was performed for the

---

air chartering. In general practice, when the Warsaw carrier functions are split between several persons, this approach would boil down to an attempt to fill this frame in the best possible way. This situation conceivably, offers at least three possible solutions. All people exercising Warsaw carrier functions may be Warsaw carriers because of such exercise. The one who exercises most of these functions may be the Warsaw carrier. Or, the one who exercises the most important of these functions may have that status.—Here Grönfors reduces the impetus of his attack on other doctrines by taking the last solution, and consid-

ers in his interpretation that the possibility to issue transportation documents is the most important function in view of the severe penalties attached to non-compliance." Sundberg 300.

63. Article 2 of the Convention declares: "This convention shall apply to transportation performed by the state or by legal entities constituted under public law * * *" The United States adhered to the treaty with the sole reservation that Article 2 should not apply "to international transportation that may be performed by the United States". 49 Stat. 3013; 78 Cong.Rec. 11582 (1934).

United States *not by* the United States." The Court's doubts were dispelled by its study of the negotiations incident to the adoption of the Hague Protocol of 1955.[64] Thus, in *Mertens* the Court held that the Warsaw Convention covered a charter flight, even though the passengers were military personnel having no direct contractual relationship with the airline and even though there was a factual as well as contractual basis for concluding that the United States (the charterer) was the carrier. We note also that if, as the plaintiffs here contend, all charter flights are beyond the scope of the Warsaw Convention, there would have been no reason to propose that the Hague Protocol exclude military charter flights.

The Second Circuit cited with approval Warren v. The Flying Tiger Line, Inc., S.D.Cal.1964, 234 F.Supp. 223, rev'd on other grounds 1965, 9 Cir., 352 F.2d 494. That case also involved a military charter. The aircraft was owned, operated, and controlled by the airline, although the United States, through the Military Air Transportation Service (MATS), determined the destination, the official stopping points, the time of departure, and the designation of passengers. The Court considered the history of the Hague Protocol of 1955 and its antecedents and concluded that "the reservation did not apply to military chartered flights * * * performed directly by the State". The plaintiffs contended that Convention was not applicable since the passengers were military men who were not free to contract for the travel in question. As to this, the Court, relying on Ross v. Pan American Airways, 1949, 299 N.Y. 88, 85 N.E.2d 880, held:

"As pointed out in *Ross*, the aims of the Convention would be poorly served if it were held that the limitation of liability is available only where the carrier proved a consensual agreement. It seems evident that *the Convention anticipated the application of the limitation of liability where the carrier complied with article 3, which, among other things, required that a ticket be delivered to the passenger with a statement on it that the transportation was subject to the rules relating to liability established by the Warsaw Convention.*"

*Ross* did not involve a charter flight. In that case the flight was an ordinary flight, but the passenger's ticket had been purchased for the plaintiff, Miss Jane Froman, by a USO agent. The plaintiff said that she had never seen it. The court held that there was no need for the carrier to show more than the delivery of the ticket and the travel of the passenger in accordance with the ticket. The "Convention has automatic full impact, by its own terms and not because the parties have so agreed". 85 N.E.2d at 885. The court did not hold that there was no contract; the court found that there was such a relationship through one Abraham as agent or

64. "A draft protocol was prepared by the Legal Committee of the International Civil Aviation Organization at Rio de Janeiro in September 1953 and was submitted to the Hague Conference in September 1955. It sought to amend Article 2 of the Convention to read: 'The Convention shall not apply to * * * [c]arriage of persons, cargo and baggage for military authorities by aircraft the whole capacity of which has been reserved by such authorities.' The natural inference from this effort to amend the Convention is that without such an amendment the Convention would be applicable to such flights, or at least those proposing the amendment thought so. The proposed amendment was rejected by the Conference, though not because the representatives thought this exclusion was already provided for in Article 2. Instead, *the representatives thought it more appropriate to let each individual Contracting Party, if it so chose, to make the Convention inapplicable to flights chartered by the military.* Accordingly, a nation adhering to the Protocol was granted the legal power to declare that the Convention shall not apply *to military charter flights* on aircraft registered in that country, Article XXVI, Hague Protocol (Protocol Amending Convention for the Unification of Certain Rules to International Carriage by Air, The Hague, September 28, 1955), S.Doc. No. Executive H. 86th Cong., 1st Sess." 341 F.2d at 854.

through Miss Froman's ratification of Abraham's actions.

Two decisions in the French courts hold that the Warsaw Convention applied to the charter flight that were the subject of the litigation. Air-Algérie v. Fuller Fréres, Cour de Cassation (Ch. civile Sect. Com.) (1956) (Defendant's Exhibit G–1); Trésor Public v. Cie. Aigle Azur, Tribunal de al Grande Instance de la Seine (1 Ch. 3 Sect.) (1960) (Defendant's Exhibit G–2). In the *Air Algérie* case shippers sued freight forwarders who had chartered aircraft and the forwarders impleaded the operators. In Trésor Public v. Cie. Aigle two passengers were killed in the crash of a chartered plane on a flight between Laos and Viet Nam. Heirs sued the airline which, as in this case, was both the owner and operator of the aircraft. The court held that the Convention applied and that the Warsaw prescriptive period for suits, Article 29, barred recovery.

We do not rest our holding on these cases, because in none was the court's attention called to the issues before this Court.

## VI.

 We base our holding on the facts this case presents, the text of the Warsaw Convention, and the extrinsic aids to which we turned in our quest for the true meaning of the Treaty. The Warsaw Convention is based on the existence of a contract of carriage between the air carrier and the passenger. When a passenger is transported a contract of carriage exists whether or not the transportation is undertaken pursuant to an air charter. It exists regardless of the contractual relationships between the owner and the charterer and between the charterer and the passenger. Here Air France was the carrier. Air France assumed full contractual responsibility for the transportation of the passengers. In recognition of that responsibility, Air France controlled the aircraft and operated it through an Air France crew. A passenger's right to be carried came into being only on the issuance and delivery of an individual ticket by Air France showing on its face the airline's obligation to perform the contract of transportation under the provisions of the Warsaw Convention. We hold therefore that the Convention applied to the transaction of the passengers in accordance with the charter flight agreement between Air France and the Atlanta Art Association.

The judgment is affirmed.

JONES, Circuit Judge (dissenting):

Federal jurisdiction is based on diversity of citizenship. 28 U.S.C.A. § 1332. The case is therefore one for the application of Erie-Tompkins principles.

As stated in the majority opinion, Air France asserts three defenses: (1) that the flight was governed by the Warsaw Convention limiting liability to $8,291.97 for each person killed, (2) that the flight charter agreement or the tickets issued to each passenger purporting to incorporate by reference to the Warsaw provision, restricted recovery to the amount limited by the Warsaw Convention, and (3) that the law of France, where the accident occurred was controlling and that by such law the Warsaw limitation was applicable.

It is my view that the courts of Georgia, including a Federal court in a diversity case, are free to reject a limitation of liability of the law of the place where the fatal injury occurred and apply its own more liberal rule of unrestricted liability. Pearson v. Northeast Air Lines, 2nd Cir. 1962, 309 F.2d 553. The public policy of Georgia, enforced by its courts, renders invalid any contractual provision limiting the liability of a carrier of a fare-paying passenger for personal injuries. Southern Railway Co. v. Watson, 110 Ga. 681, 36 S.E. 209; Central of Georgia Railway Co. v. Lippman, 110 Ga. 665, 36 S.E. 202, 50 L.R.A. 673. These principles would permit and probably would require a Georgia court to allow the plaintiffs in this litigation to recover such damages as they might prove, in the event liability is established, unless precluded from so doing by the Warsaw Convention.

Near the beginning of the majority opinion it is declared tha: "The Warsaw Convention applies to the international transportation of passengers under a contract of carriage on a 'voyage' charter flight." If I thought this was a correct statement of principles, I would agree that the judgment of the district court should be affirmed. Holding the view that the statement is not a correct statement of the controlling rule of law, I dissent.

The Warsaw Convention does not expressly include charter flights within the limitation of liability provision, nor are such flights expressly excluded from its operation. A treaty is to be construed in the light of the conditions and circumstances existing at the time of the treaty. Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox, Ltd., 291 U.S. 138, 54 S.Ct. 361, 78 L.Ed. 695; In re Zalewski's Estate, 292 N.Y. 332, 55 N.E.2d 184, 157 A.L.R. 87; Universal Adjustment Corporation v. Midland Bank, 281 Mass. 303, 184 N.E. 152, 87 A.L.R. 1407. The date of the Warsaw Convention was 1929. The Lindberg flight was two years earlier. The establishment of transatlantic passenger service was in 1939, ten years after the treaty. The circumstances existing in aviation were such in 1939 as to make it improbable that charter flights were within the contemplation of those who made the treaty.

If alternative meanings can be placed upon a treaty, the one adopted should, if possible, be that which is least restrictive of the rights of individuals. Universal Adjustment Corporation v. Midland Bank, supra. The rule that invalidates contract provisions which restrict the rights of passengers to recover for personal injuries is one generally prevailing in the United States. 13 C.J.S. Carriers § 629, p. 1182. The rule is founded upon public policy. Aetna Casualty & Surety Co. v. Prather, 59 Ga.App. 797, 2 S.E.2d 115; Philippine Air Lines, Inc. v. Texas Engineering & Manufacturing Co., Inc., 5th Cir. 1950, 181 F.2d 923. Where the meaning of a treaty depends upon construction, as I think is the case

here, the meaning adopted should be that which is consistent with a generally prevailing rule of public policy rather than one which should override it.

The scholarly magnum opus of the majority is most persuasive but I remain unconvinced. Therefore I dissent.